Peter Jakab (PJ-8553)
FEIN & JAKAB
THE WOOLWORTH BUILDING
233 Broadway • Suite 930
New York, NY 10279
212 732 9290 Ph
212 227 6479 Fx

*Attorneys for Plaintiff*
JAMES DREYFUSS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JAMES DREYFUSS,<br><br>                              Plaintiff,<br><br>    - against -<br><br>ETELECARE GLOBAL SOLUTIONS-US, INC., a<br>Delaware corporation,<br><br>                              Defendant. | **ECF CASE**<br><br>Case No.:   08 cv 1115 (RJS)<br><br><br>**DECLARATION**<br>**OF PETER JAKAB** |

        PETER JAKAB, pursuant to 28 U.S.C. §1746, declares as follows:

    I am an member of the law firm of Fein & Jakab, attorneys for the Plaintiff, James Dreyfuss,

in this action.  I submit this declaration in opposition to Defendant's motion to compel arbitration

or, in the alternative, to strike Plaintiff's jury demand.

    Attached hereto as Exhibit A are all six (6) employee arbitration agreements produced by

Defendant to the undersigned pursuant to the Court's Order dated June 16, 2008.

     Attached hereto as Exhibit B is a true and correct of the transcript of the June 16, 2008

teleconference among all counsel and the Court.

    Attached hereto as Exhibit C is a true and correct copy of the parties' 2006 agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of July 2008 in New York, NY


$\underline{\hspace{3cm} /s/ \hspace{3cm}}$.
PETER JAKAB



May 18, 2004

Scott Kreitzman

Dear Scott:

We are pleased to extend to you this offer of continued employment with Phase 2 Solutions, Inc., an Arizona corporation (the "Company"), and subsidiary of eTelecare International, Inc., a Metro-Manila, Philippines corporation ("Parent"). This letter agreement (the "Agreement") sets forth the terms of your compensation and employment with the Company.

1. Position:

(a)    While employed at the Company, your position will be Vice President Sales and Marketing, reporting to Susan Knox, Senior Vice President of Sales and Marketing of the Company. You may be assigned other duties as needed and your duties may change from time to time on reasonable notice, based on the needs of the Company and your skills, as determined by the Company.

(b)    This Agreement shall commence on the effective date (the "Effective Date") of the acquisition of all of the outstanding capital stock of the Company by a subsidiary of the Parent pursuant to the Stock Purchase Agreement dated March 31, 2004 between Parent, the Shareholders of the Company, and the Company. The Effective Date is currently expected to be May 19, 2004.

(c)    During the term of your employment, you agree that you will devote all of your business time and attention to the business of the Company, unless the Company expressly agrees otherwise. You are not permitted to engage in any business activity that competes with the Company's business.

(d)    You understand that the Company reserves the right to make personnel decisions regarding your employment, including but not limited to decisions regarding any promotion, salary adjustment, transfer or disciplinary action, up to and including termination.

2. Compensation:

Your salary will initially be $          on an annualized basis, and you will be paid a monthly salary of $          less regular payroll deductions. You will also have the opportunity to receive bonus compensation based on your performance and other criteria, as set forth on Exhibit A hereto, as such may be adjusted from time to time by the Company    In

eTelecare 0046

addition, you may be eligible for other bonuses and awards as the Company may implement from time to time. In addition, your salary and bonus will generally be reviewed annually as part of the Company's normal salary review process. The Company reserves the right to change your compensation from time to time on reasonable notice.

Benefits. The Company will provide you with medical and dental insurance benefits equivalent to those you currently receive, continued matching of your 401(k) benefit, and paid vacation and holidays in accordance with the Company policy. The Company reserves the right to change your benefits from time to time on reasonable notice.

Proprietary Information Agreement. As a condition of your employment with the Company, you will be required to sign and abide by the terms of the Company's proprietary information agreement in the form attached hereto as Exhibit B, which is incorporated into this Agreement by reference. You also represent and warrant to the Company that the performance of your duties will not violate any agreements with or trade secrets of any other person or entity.

Immigration Documentation Please be advised that your employment is contingent on your ability to prove your identity and authorization to work in the U.S. for the Company. You must comply with the Immigration and Naturalization Service's employment verification requirements.

Dispute Resolution. Any dispute between the parties arising out of or relating to this Agreement or the breach hereof, or your employment or the termination thereof, shall be settled in Phoenix, Arizona, by arbitration in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association. The decision of the arbitrator shall be final and binding on the parties, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration will be in lieu of a jury trial and the parties hereto each waive their right to a jury trial. The parties hereby agree that the arbitrator shall be empowered to enter an equitable decree mandating specific enforcement of the terms of this Agreement. Both parties hereby consent to personal jurisdiction of the state and federal courts located in the State of Arizona for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.

Integrated Agreement. Please note that this Agreement including the exhibits attached hereto supersedes any prior agreements, representations or promises of any kind, whether written, oral, express or implied between the parties hereto with respect to the subject matters herein. This Agreement including the exhibits attached hereto constitutes the full, complete and exclusive agreement between you and the Company with respect to the subject matters herein. This Agreement cannot be changed unless in writing, signed by you and another officer of the Company.

Severability. If any term of this Agreement is held to be invalid, void or unenforceable, the remainder of this Agreement shall remain in full force and effect and shall in no way be affected; and, the parties shall use their best efforts to find an alternative way to achieve the same result.

* * *

- 2 -

eTelecare 0047

Victor, as you know, we are very excited about the contribution you can make to the future success of the Company, and we look forward to your continued employment with our organization. In order to confirm your agreement with and acceptance of these terms, please sign a copy of this letter and return it to me. If there is any matter in this letter that you wish to discuss further, please do not hesitate to call me.

Sincerely,


Larry Willett
President, Phase 2


James Franke
President, eTelecare International


I accept Phase 2 Solutions, Inc.'s offer under the terms expressed in this letter. I understand that this is not an employment contract for any fixed period

Scott Kreitzman

5/2/04
May 18, 2004

- 3 -

Exhibit "A"

Compensation

*Base Salary*                                                    **$125,000**

## Variable Compensation

### Contract Revenue Commission

*Outside U.S:*

| | |
|---|---|
| $12-16/hr - 3.00% 1st 12 months, 66% 2nd 12 months | 50% |
| $17-22/hr - 4.00% 1st 12 months, 66% 2nd 12 months | 20% |

*Outside U.S:*

| | |
|---|---|
| $22-25/hr - 0.75% 1st 12 months, 66% 2nd 12 months | 10% |
| $26-28/hr - 1.00% 1st 12 months, 66% 2nd 12 months | 15% |
| $29-32/hr - 2.00% 1st 12 months, 66% 2nd 12 months | 5% |
| $33-39/hr - 3.00% 1st 12 months, 66% 2nd 12 months | 0% |
| $40-43/hr - 4.00% 1st 12 months, 66% 2nd 12 months | 0% |
| $44-50/hr - 4.50% 1st 12 months, 66% 2nd 12 months | 0% |

### Year 2 Revenue Commission

### Quota Attainment Bonus

| | |
|---|---|
| 25% commission bonus in quota month at quota equal to | 35714 |
| 1/12 billable (commissionable) hours. | approx 3 mos target |

## 1. Salary

Regional Vice President (RVP) will be paid salary on a bi-monthly basis. RVP is expected to manage territory, build pipeline, create value proposition, build executive relationships, keep CRM OnDemand up to date, and ensure all customers in assigned territory are successful.

## 2. Contract Revenue Commission

Net commissionable revenue is billed revenue less unusual expenses (cost for leads, purchase of special telecom equipment, etc.), multiplied by appropriate commission rate. Standard program design, IT programming, standard data connectivity, program management, administration, quality monitoring, supervision, and standard support staff are considered normal expenses.

Commissionable hourly rate is calculated as net billable revenue / number billable hours. In outbound programs, $1 per hour is subtracted from the hourly rate to account for outbound telecom costs.

To convert a per call or per minute rate to the commissionable hourly rate we will use the commitment of occupancy from operations during the pricing phase.

In the event a client has a blended program, the hours worked in the U.S. vs. Outside U.S. will be used to weight the rates U.S. vs. Outside U.S.

If the company is required to pay broker fees or finders fees on a program, it will be at management's discretion to net up to the full amount from the billed revenue to calculate commissionable revenue.

eTelecare 0049

Commissions are earned based on customer commitment per compensation plan and paid on the 10th of the month for all collected revenues from the previous month.

Highly profitable non CSR revenue such as IVR, OCR, etc. will be paid at the 4.5% rate. Commission on other offerings will be determined by management.

A new project is defined as a qualified opportunity in the Siebel CRM On Demand system including but not limited to moving onshore programs offshore. Start date is the 1st day of the first full billable month.

### 3. Quota Attainment Bonus
In the month the RVP attain monthly hour quota, a 25% commission uplift will be applied.

Monthly quota is annual billable hour quota divided by 12 months.


**EMPLOYEE**

ACCEPTED AND AGREED TO BY:

PHASE 2 SOLUTIONS, INC.

By _____

By_____

Print Name:  Scott Kreitzman

Print Name  Larry Willett_____

Title  President, Phase 2_____

Social Security No.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

Address:  20536 Deer Watch Place
Ashburn, VA, 20147

Error! Unknown document property name.

eTelecare 0050

**Exhibit B**

## PHASE 2 SOLUTIONS, INC.

### PROPRIETARY INFORMATION AND
### INVENTIONS AGREEMENT FOR EMPLOYEES

Phase 2 Solutions, Inc. (the "Company") is engaged in a continuous effort of technical innovation, product development and marketing, and administration of the Company's business. The success of these efforts depends on the Company's ability to draw upon the creative talents of its employees and to maintain the flow of information among its employees. For this reason, all employees of the Company are requested to sign this Agreement under which:

A.    The employee agrees to protect against unauthorized disclosure of confidential information of the Company or other persons and to return to the Company such information when employee's employment with the Company terminates;

B.    The employee agrees to disclose, and that the Company will exclusively own, ideas, works and inventions which relate to the Company's business;

C.    The employee agrees to avoid conflicting outside employment with any firm that competes directly or indirectly with the Company while employed by the Company; and

D.    The employee agrees that the employee will not solicit other Company employees for one year from termination of employment.

In consideration for the compensation received by me for employment with the Company, and effective as of the date that my employment commences, I agree as follows:

eTelecare 0051

## Protection of Confidential Information

**Confidentiality Obligations.** During and after the term of my employment, I will regard and preserve as confidential, and will not divulge to unauthorized persons, or use for any unauthorized purposes, nor will I authorize or encourage any other person to divulge or use for any unauthorized purposes, any information, matter or thing of secret, confidential or private nature connected with the products, services, research, development or business of the Company ("Confidential Information") without the prior written consent of an officer of the Company.

**Examples of Confidential Information.** Confidential Information shall mean any and all confidential or proprietary knowledge, data or information of the Company. By way of illustration but not of limitation, Confidential Information shall include such items as know-how, formulae, computer programs, software, designs, schematics, pricing or cost information, telephone lists, conventional mail and e-mail lists, customer lists, salary and compensation information, inventions, research projects, plans for future development and any other information of a similar nature, whether received directly or indirectly from the Company or obtained through reverse-engineering. Confidential Information also includes the Work Product (as defined in Section 0 below), as well as confidential or proprietary information of a third party to whom Company owes a duty of confidentiality or non-use.

**Unauthorized Persons and Purposes.** An "unauthorized person" means any person who does not have a need to know the information to further a Company-authorized purpose, or who is not obligated to maintain such information in confidence and to use such information only for a Company-authorized purpose, or who is not otherwise approved in writing by an officer of the Company. An "unauthorized purpose" means a purpose that does not further the interests of the Company or that is not otherwise approved in writing by an officer of the Company.

**Consultation.** If I am in doubt as to whether certain information is Confidential Information, I agree to consult with the management of the Company.

### Disclosure and Assignment to Company of Work Product.

**Definition of Work Product and Employee Inventions.** "Work Product" means any and all ideas, inventions, improvements, discoveries, know-how, techniques and works of authorship (including but not limited to computer programs, software, logic design and documentation) and other information and materials, whether or not patentable, copyrightable or otherwise registrable under applicable statutes, that I may make, conceive, reduce to practice, develop, learn or work on, either alone or jointly with others, whether or not reduced to drawings, written description, documentation, models or other tangible form during the period of my employment by the Company.

**Company owns Work Product.** I hereby assign and agree to assign in the future (when such Work Product is first reduced to practice or is fixed in a tangible medium) to the Company and its assigns all of my rights, title and interest in and to any Work Product, and all patents, trademarks, copyrights and other statutory or common law protections in any and all countries ("IP Rights") for the Work Product, made or conceived or reduced to practice or learned by me, either alone or jointly with others during my period of employment with the Company

**Disclosure of Work Product.** I will promptly disclose to the Company, or any persons designated by it, the Work Product during the term of my employment and upon termination of my employment for any reason. I agree that if I am in doubt as to whether any given invention is Work Product or an Employee Invention, I will refer such questions to the management of the Company.

**Protection of Rights in Work Product.** I will assist the Company in every proper way (such as by signing documents and giving evidence and testimony), at the Company's expense, to perfect Company's ownership of all IP Rights in the Work Product, and otherwise to obtain for Company (or its nominees) full rights and advantages of the Work Product, in any and all countries. If I am unavailable for any reason, I hereby appoint the Company and its officers and agents, as my agents and attorneys-in-fact, to act on my behalf and instead of me, to execute and file any such document(s) and to do all other lawfully permitted acts to further the prosecution, issuance, enforcement and maintenance of IP Rights in the Work Product.

**Certain Rights of Company.** I understand that my confidentiality and assignment obligations under this Agreement do not apply to any developments, discoveries, improvements, inventions, trade secrets, or technical or journal writings or other works of authorship which I have made or conceived or first reduced to practice alone or jointly with others prior to my engagement by the Company ("Pre-Employment Inventions"). I hereby represent that I have made no such Pre-Employment Inventions as of the Effective Date of this Agreement.

Notwithstanding the foregoing, if I incorporate into Company technology, or otherwise use in the scope of my employment, any Pre-Employment Invention, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide, transferable and sublicensable license to make, have made, modify, create derivative works, reproduce, use, offer to sell, sell, import and distribute such Pre-Employment Invention as part of or in connection with such technology or the material with which I used such invention in performing my duties as an employee of the Company. I acknowledge and agree that the Company and its subsidiaries or affiliates are free to compete and develop information, inventions and products within the areas and type of the Pre-Employment Inventions.

**No Conflicting Obligations.**

**No Conflict of Interest.** During my employment with the Company, I will inform the Company before accepting any employment, consulting or other relationship with another person or entity in any field related to the Company's business. The Company's failure to object to any particular outside activity does not in any way reduce my obligations under this Agreement.

**No Breach of Other Obligations.** I represent that my performance of all of the terms of this Agreement and that my employment by the Company does not and will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. In particular, I will not disclose to the Company, or induce the Company to use, any confidential information or material in violation of the rights of my former employer or any third party. I represent and warrant that I have returned all property and confidential information belonging to all prior employers. I have not entered into, and I agree I will not enter into, any agreement (either written or oral) in conflict with this Agreement.

Error! Unknown document property name.

### Non-Solicitation; No Unfair Competition.

**Company Employees.** I agree that, during the period of my employment and for a period of one year following termination of my employment with the Company for any reason, I will not directly or indirectly solicit or in any manner encourage employees or consultants of the Company to end their relationships with the Company.

**Company Customers.** By signing this Agreement, I acknowledge and agree that (a) the identities, key contact personnel, preferences, needs and circumstances of the Company's customers are trade secrets of the Company, (b) such secrets necessarily are and will be used in the solicitation of business from the Company's customers, and (c) the sale or unauthorized use or disclosure of these trade secrets (or any other Company Confidential Information) that I obtain during the course of this Agreement would constitute unfair competition with the Company. Accordingly, I agree that, during the period of my employment and for a period of one year following termination of my employment with the Company for any reason, I will not divert or attempt to divert from the Company, business from any customer with whom I personally had business contact during the course of my employment by the Company.

**Return of Materials.** The Confidential Information, the records described in Section 1.1 above and any and all other files, data, documents, equipment, and other information and physical property furnished to me by the Company, or produced by myself or others in connection with my employment, shall be and remain the sole property of the Company. I will return promptly to the Company all such property as and when requested by the Company, or should the Company not so request, upon termination of my employment for any reason. I will not take with me any such property or any copy of such property upon such termination. I also agree that any property situated on the Company's premises, including computers, computer files, e-mail, voicemail, disks and other electronic storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice.

**Notification of New Employer.** If my employment with the Company terminates for any reason, I consent to the notification of my new employer of my rights and obligations under this Agreement.

**Miscellaneous Clauses.** This Agreement, together with the Phase 2 Solutions Employee Handbook, constitutes the entire agreement, and supersedes all previous or contemporaneous agreements or representations, whether oral or written, express or implied, between the Company and me with regard to its subject matter. This Agreements shall not be modified or waived unless in writing, signed by me and the President of the Company (or his or her designee). If any term or provision of the Agreement shall be declared invalid, illegal or unenforceable, such term or provision shall be amended to achieve as nearly as possible the same effect of protecting Confidential Information as the original term or provision, and all remaining provisions shall continue in full force and effect. This Agreement shall be binding upon my heirs, executors, administrators or other legal representatives and shall inure to the benefit of successors and assigns of the Company. This Agreement shall be governed by and construed in accordance with

eTelecare 0054

the laws of the State of Arizona for contracts entered into in Arizona between Arizona residents, without regard for conflict of laws principles.

By my signature below, I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with such provisions.

### [SIGNATURE PAGE FOLLOWS]

Error! Unknown document property name.

eTelecare 0055

Dated: May 18, 2004

EMPLOYEE                                    ACCEPTED AND AGREED TO BY.

                                           . PHASE 2 SOLUTIONS, INC.

By _____                   By_____

Print Name: Scott Kreitzman                Print Name  Larry Willett_____

                                           Title  President, Phase 2_____

Social Security No.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

Address:  20536 Deerwatch Place
Ashburn, VA. 20147

Error! Unknown document property name.

eTelecare 0056



May 18, 2004

*Buzz*
Marius Stitzer

Dear Buzz:

We are pleased to extend to you this offer of continued employment with Phase 2 Solutions, Inc., an Arizona corporation (the "Company"), and subsidiary of eTelecare International, Inc., a Metro-Manila, Philippines corporation ("Parent"). This letter agreement (the "Agreement") sets forth the terms of your compensation and employment with the Company.

1. Position:

(a)    While employed at the Company, your position will be Vice President of Organizational Improvement, reporting to Art Graf, Jr., Vice Chief Financial Officer and Chief Operations Officer of the Company. You may be assigned other duties as needed and your duties may change from time to time on reasonable notice, based on the needs of the Company and your skills, as determined by the Company.

(b)    This Agreement shall commence on the effective date (the "Effective Date") of the acquisition of all of the outstanding capital stock of the Company by a subsidiary of the Parent pursuant to the Stock Purchase Agreement dated March 31, 2004 between Parent, the Shareholders of the Company, and the Company. The Effective Date is currently expected to be May 19, 2004.

(c)    During the term of your employment, you agree that you will devote all of your business time and attention to the business of the Company, unless the Company expressly agrees otherwise. You are not permitted to engage in any business activity that competes with the Company's business.

(d)    You understand that the Company reserves the right to make personnel decisions regarding your employment, including but not limited to decisions regarding any promotion, salary adjustment, transfer or disciplinary action, up to and including termination.

2. Compensation:

Your salary will initially be $          on an annualized basis, and you will be paid a monthly salary of $          less regular payroll deductions. You will also have the opportunity to receive bonus compensation based on your performance and other criteria, as set forth on Exhibit A hereto, as such may be adjusted from time to time by the Company. In

eTelecare 0038

addition, you may be eligible for other bonuses and awards as the Company may implement from time to time. In addition, your salary and bonus will generally be reviewed annually as part of the Company's normal salary review process. The Company reserves the right to change your compensation from time to time on reasonable notice.

Benefits.  The Company will provide you with medical and dental insurance benefits equivalent to those you currently receive, continued matching of your 401(k) benefit, and paid vacation and holidays in accordance with the Company policy. The Company reserves the right to change your benefits from time to time on reasonable notice.

Stock Options.  In consideration of his acceptance of employment with the Company, the Parent has agreed to grant to you an option to purchase 10,000 shares of the common stock of the Parent (each, a "Share", and collectively, the "Shares"). The options are being granted under, and shall be governed by, Parent's Employee Stock Option Plan, a copy of which is attached hereto as Exhibit B. Each option shall be exercisable at the rate of $7.00 per Share, and all unexercised options shall expire on the fifth anniversary of the Effective Date. The options shall vest as to 25% of the total grant on each of the first, second, third and fourth anniversary of the Effective Date. You will also be eligible to receive additional option grants during your employment with the Company, subject to the terms set forth in the Parent's Employee Stock Option Plan and as determined by Parent's Board of Directors.

Proprietary Information Agreement.  As a condition of your employment with the Company, you will be required to sign and abide by the terms of the Company's proprietary information agreement in the form attached hereto as Exhibit C, which is incorporated into this Agreement by reference. You also represent and warrant to the Company that the performance of your duties will not violate any agreements with or trade secrets of any other person or entity.

Immigration Documentation.  Please be advised that your employment is contingent on your ability to prove your identity and authorization to work in the U.S. for the Company. You must comply with the Immigration and Naturalization Service's employment verification requirements.

Dispute Resolution.  Any dispute between the parties arising out of or relating to this Agreement or the breach hereof, or your employment or the termination thereof, shall be settled in Phoenix, Arizona, by arbitration in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association. The decision of the arbitrator shall be final and binding on the parties, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration will be in lieu of a jury trial and the parties hereto each waive their right to a jury trial. The parties hereby agree that the arbitrator shall be empowered to enter an equitable decree mandating specific enforcement of the terms of this Agreement. Both parties hereby consent to personal jurisdiction of the state and federal courts located in the State of Arizona for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.

Integrated Agreement.  Please note that this Agreement including the exhibits attached hereto supersedes any prior agreements, representations or promises of any kind, whether written, oral, express or implied between the parties hereto with respect to the subject matters

herein. This Agreement including the exhibits attached hereto constitutes the full, complete and exclusive agreement between you and the Company with respect to the subject matters herein. This Agreement cannot be changed unless in writing, signed by you and another officer of the Company.

Severability.  If any term of this Agreement is held to be invalid, void or unenforceable, the remainder of this Agreement shall remain in full force and effect and shall in no way be affected; and, the parties shall use their best efforts to find an alternative way to achieve the same result.

\* \* \*

- 3 -

Buzz, as you know, we are very excited about the contribution you can make to the future success of the Company, and we look forward to your continued employment with our organization. In order to confirm your agreement with and acceptance of these terms, please sign a copy of this letter and return it to me. If there is any matter in this letter that you wish to discuss further, please do not hesitate to call me.

Sincerely,

Larry Willett
President, Phase 2

James Franke
President, eTelecare International

I accept Phase 2 Solutions, Inc.'s offer under the terms expressed in this letter. I understand that this is not an employment contract for any fixed period.

Marius Stitzer                                    May 18, 2004

- 4 -



May 18, 2004

Dino Ouradnik

Dear Dino:

We are pleased to extend to you this offer of continued employment with Phase 2 Solutions, Inc., an Arizona corporation (the "Company"), and subsidiary of eTelecare International, Inc., a Metro-Manila, Philippines corporation ("Parent"). This letter agreement (the "Agreement") sets forth the terms of your compensation and employment with the Company.

1. Position:

(a)        While employed at the Company, your position will be Director Sales Operations, reporting to Brett Ransom, Vice President of Sales Operations of the Company. You may be assigned other duties as needed and your duties may change from time to time on reasonable notice, based on the needs of the Company and your skills, as determined by the Company.

(b)        This Agreement shall commence on the effective date (the "Effective Date") of the acquisition of all of the outstanding capital stock of the Company by a subsidiary of the Parent pursuant to the Stock Purchase Agreement dated March 31, 2004 between Parent, the Shareholders of the Company, and the Company. The Effective Date is currently expected to be May 19, 2004.

(c)        During the term of your employment, you agree that you will devote all of your business time and attention to the business of the Company, unless the Company expressly agrees otherwise. You are not permitted to engage in any business activity that competes with the Company's business.

(d)        You understand that the Company reserves the right to make personnel decisions regarding your employment, including but not limited to decisions regarding any promotion, salary adjustment, transfer or disciplinary action, up to and including termination.

2. Compensation:

Your salary will initially be $        on an annualized basis, and you will be paid a monthly salary of $        less regular payroll deductions. You will also have the opportunity to receive bonus compensation based on your performance and other criteria, as set forth on Exhibit A hereto, as such may be adjusted from time to time by the Company. In addition, you may be eligible for other bonuses and awards as the Company may implement

eTelecare 0042

from time to time. In addition, your salary and bonus will generally be reviewed annually as part of the Company's normal salary review process. The Company reserves the right to change your compensation from time to time on reasonable notice.

Benefits. The Company will provide you with medical and dental insurance benefits equivalent to those you currently receive, continued matching of your 401(k) benefit, and paid vacation and holidays in accordance with the Company policy. The Company reserves the right to change your benefits from time to time on reasonable notice.

Stock Options. In consideration of his acceptance of employment with the Company, the Parent has agreed to grant to you an option to purchase 10,000 shares of the common stock of the Parent (each, a "Share", and collectively, the "Shares"). The options are being granted under, and shall be governed by, Parent's Employee Stock Option Plan, a copy of which is attached hereto as Exhibit B. Each option shall be exercisable at the rate of $7.00 per Share, and all unexercised options shall expire on the fifth anniversary of the Effective Date. The options shall vest as to 25% of the total grant on each of the first, second, third and fourth anniversary of the Effective Date. You will also be eligible to receive additional option grants during your employment with the Company, subject to the terms set forth in the Parent's Employee Stock Option Plan and as determined by Parent's Board of Directors.

Proprietary Information Agreement. As a condition of your employment with the Company, you will be required to sign and abide by the terms of the Company's proprietary information agreement in the form attached hereto as Exhibit C, which is incorporated into this Agreement by reference. You also represent and warrant to the Company that the performance of your duties will not violate any agreements with or trade secrets of any other person or entity.

Immigration Documentation. Please be advised that your employment is contingent on your ability to prove your identity and authorization to work in the U.S. for the Company. You must comply with the Immigration and Naturalization Service's employment verification requirements.

Dispute Resolution. Any dispute between the parties arising out of or relating to this Agreement or the breach hereof, or your employment or the termination thereof, shall be settled in Phoenix, Arizona, by arbitration in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association. The decision of the arbitrator shall be final and binding on the parties, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration will be in lieu of a jury trial and the parties hereto each waive their right to a jury trial. The parties hereby agree that the arbitrator shall be empowered to enter an equitable decree mandating specific enforcement of the terms of this Agreement. Both parties hereby consent to personal jurisdiction of the state and federal courts located in the State of Arizona for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.

Integrated Agreement. Please note that this Agreement including the exhibits attached hereto supersedes any prior agreements, representations or promises of any kind, whether written, oral, express or implied between the parties hereto with respect to the subject matters herein. This Agreement including the exhibits attached hereto constitutes the full, complete and

- 2 -

exclusive agreement between you and the Company with respect to the subject matters herein. This Agreement cannot be changed unless in writing, signed by you and another officer of the Company.

Severability. If any term of this Agreement is held to be invalid, void or unenforceable, the remainder of this Agreement shall remain in full force and effect and shall in no way be affected; and, the parties shall use their best efforts to find an alternative way to achieve the same result.

* * *

eTelecare 0044

Dino, as you know, we are very excited about the contribution you can make to the future success of the Company, and we look forward to your continued employment with our organization. In order to confirm your agreement with and acceptance of these terms, please sign a copy of this letter and return it to me. If there is any matter in this letter that you wish to discuss further, please do not hesitate to call me.

Sincerely,

_____

Larry Willett
President, Phase 2

_____

James Franke
President, eTelecare International

I accept Phase 2 Solutions, Inc.'s offer under the terms expressed in this letter. I understand that this is not an employment contract for any fixed period.

_____          _____
Dino Ouradnik                              May 18, 2004

- 4 -

eTelecare 0045



May 18, 2004

Victor Sese

Dear Victor:

We are pleased to extend to you this offer of continued employment with Phase 2 Solutions, Inc., an Arizona corporation (the "Company"), and subsidiary of eTelecare International, Inc., a Metro-Manila, Philippines corporation ("Parent"). This letter agreement (the "Agreement") sets forth the terms of your compensation and employment with the Company.

1. **Position:**

(a)      While employed at the Company, your position will be Vice President Sales and Marketing, reporting to Susan Knox, Senior Vice President of Sales and Marketing of the Company. You may be assigned other duties as needed and your duties may change from time to time on reasonable notice, based on the needs of the Company and your skills, as determined by the Company.

(b)      This Agreement shall commence on the effective date (the "Effective Date") of the acquisition of all of the outstanding capital stock of the Company by a subsidiary of the Parent pursuant to the Stock Purchase Agreement dated March 31, 2004 between Parent, the Shareholders of the Company, and the Company. The Effective Date is currently expected to be May 19, 2004.

(c)      During the term of your employment, you agree that you will devote all of your business time and attention to the business of the Company, unless the Company expressly agrees otherwise. You are not permitted to engage in any business activity that competes with the Company's business.

(d)      You understand that the Company reserves the right to make personnel decisions regarding your employment, including but not limited to decisions regarding any promotion, salary adjustment, transfer or disciplinary action, up to and including termination.

2. **Compensation:**

Your salary will initially be $         on an annualized basis, and you will be paid a monthly salary of $         less regular payroll deductions. You will also have the opportunity to receive bonus compensation based on your performance and other criteria, as set forth on Exhibit A hereto, as such may be adjusted from time to time by the Company. In

eTelecare 0057

addition, you may be eligible for other bonuses and awards as the Company may implement from time to time. In addition, your salary and bonus will generally be reviewed annually as part of the Company's normal salary review process. The Company reserves the right to change your compensation from time to time on reasonable notice.

Benefits. The Company will provide you with medical and dental insurance benefits equivalent to those you currently receive, continued matching of your 401(k) benefit, and paid vacation and holidays in accordance with the Company policy. The Company reserves the right to change your benefits from time to time on reasonable notice.

Proprietary Information Agreement. As a condition of your employment with the Company, you will be required to sign and abide by the terms of the Company's proprietary information agreement in the form attached hereto as Exhibit B, which is incorporated into this Agreement by reference. You also represent and warrant to the Company that the performance of your duties will not violate any agreements with or trade secrets of any other person or entity.

Immigration Documentation. Please be advised that your employment is contingent on your ability to prove your identity and authorization to work in the U.S. for the Company. You must comply with the Immigration and Naturalization Service's employment verification requirements.

Dispute Resolution. Any dispute between the parties arising out of or relating to this Agreement or the breach hereof, or your employment or the termination thereof, shall be settled in Phoenix, Arizona, by arbitration in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association. The decision of the arbitrator shall be final and binding on the parties, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The arbitration will be in lieu of a jury trial and the parties hereto each waive their right to a jury trial. The parties hereby agree that the arbitrator shall be empowered to enter an equitable decree mandating specific enforcement of the terms of this Agreement. Both parties hereby consent to personal jurisdiction of the state and federal courts located in the State of Arizona for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.

Integrated Agreement. Please note that this Agreement including the exhibits attached hereto supersedes any prior agreements, representations or promises of any kind, whether written, oral, express or implied between the parties hereto with respect to the subject matters herein. This Agreement including the exhibits attached hereto constitutes the full, complete and exclusive agreement between you and the Company with respect to the subject matters herein. This Agreement cannot be changed unless in writing, signed by you and another officer of the Company.

Severability. If any term of this Agreement is held to be invalid, void or unenforceable, the remainder of this Agreement shall remain in full force and effect and shall in no way be affected; and, the parties shall use their best efforts to find an alternative way to achieve the same result.

* * *

eTelecare 0058

Victor, as you know, we are very excited about the contribution you can make to the future success of the Company, and we look forward to your continued employment with our organization. In order to confirm your agreement with and acceptance of these terms, please sign a copy of this letter and return it to me. If there is any matter in this letter that you wish to discuss further, please do not hesitate to call me.

Sincerely,

_____

Larry Willett
President, Phase 2

_____

James Franke
President, eTelecare International

I accept Phase 2 Solutions, Inc.'s offer under the terms expressed in this letter. I understand that this is not an employment contract for any fixed period.

_____        _____
Victor Sese                                                    May 18, 2004

- 3 -

eTelecare 0059

## MUTUAL AGREEMENT TO ARBITRATE CLAIMS

I recognize that differences may arise between eTelecare International, Inc. and/or its related or affiliated companies or entities, and/or their predecessors or successors (collectively the "Company") and me during or following my employment with the Company, and that those differences may or may not be related to my employment. I understand and agree that by entering into this Agreement to Arbitrate Claims ("Agreement"), I anticipate gaining the benefits of a speedy, impartial dispute-resolution procedure.

Except as provided in this Agreement, the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Agreement. To the extent that the Federal Arbitration Act is inapplicable, California law pertaining to agreements to arbitrate shall apply.

I understand that any reference in this Agreement to the Company will be a reference also to its parent company, all of its subsidiary and affiliated entities, all benefit plans, the benefit plans' sponsors, fiduciaries, administrators, and affiliates, and all successors and assigns of any of them.

### Claims Covered by the Agreement

The Company and I mutually consent to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, whether or not arising out of my employment (or its termination), that the Company may have against me or that I may have against the Company or against its officers, directors, employees or agents in their capacity as such or otherwise. The only claims that are arbitable are those that, in the absence of this Agreement, would have been justiciable under applicable state or federal law. The claims covered by this Agreement include, but are not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, race, sex, sexual orientation, religion, national origin, age, marital status, or medical condition, handicap or disability); claims for benefits (except claims under an employee benefit or pension plan that either (1) specifies that its claims procedure shall culminate in an arbitration procedure different from this one, or (2) is underwritten by a commercial insurer which decides claims); and claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance, except claims excluded elsewhere in this Agreement.

Except as otherwise provided in this Agreement, both the Company and I agree that neither of us shall initiate or prosecute any lawsuit or administrative action (other than an administrative charge of discrimination to the EEOC, California Department of Fair

eTelecare 0027

Employment and Housing, or similar fair employment practices agency, or an administrative charge within the jurisdiction of the National Labor Relations Board), in any way related to any claim covered by this Agreement.

### Claims Not Covered by the Agreement

Claims for workers' compensation or unemployment compensation benefits are not covered by this Agreement.

### Required Notice of All Claims and Statute of Limitations

The Company and I agree that the aggrieved party must give written notice of any claim to the other party no later than the applicable Statute of Limitations as may be prescribed by law.

Written notice to the Company, or its officers, directors, employees or agents, shall be sent to its President at 602 East Huntington Drive, Suite H, Monrovia, California 91016. I will be given written notice at the last address recorded in my personnel file.

The written notice shall identify and describe the nature of all claims asserted and the facts upon which such claims are based. The notice shall be sent to the other party by certified or registered mail, return receipt requested.

### Representation

Any party may be represented by an attorney or other representative selected by the party.

### Discovery

Each party shall have the right to take the deposition of one individual and any expert witness designated by another party. Each party also shall have the right to make requests for production of documents to any party. The subpoena right specified below shall be applicable to discovery pursuant to this paragraph. Additional discovery may be had only where the arbitrator selected pursuant to this Agreement so orders, upon a showing of substantial need.

### Designation of Witnesses

At least 30 days before the arbitration, the parties must exchange lists of witnesses, including any expert, and copies of all exhibits intended to be used at the arbitration.

### Subpoenas

Each party shall have the right to subpoena witnesses and documents for the arbitration.

2

eTelecare 0028

### Arbitration Procedures

The arbitration will be held under the auspices of either the American Arbitration Association ("AAA") or Judicial Arbitration & Mediation Services, Inc. ("J·A·M·S"), with the designation of the sponsoring organization to be made by the party who did not initiate the claim.

The Company and I agree that, except as provided in this Agreement, the arbitration shall be in accordance with the AAA's then-current employment arbitration procedures (if AAA is designated) or the then-current J·A·M·S employment arbitration rules (if J·A·M·S is designated). The arbitrator shall be either a retired judge, or an attorney licensed to practice law in the state in which the arbitration is convened (the "Arbitrator"). The arbitration shall take place in or near the city in which I was last employed by the Company.

The Arbitrator shall be selected as follows. The sponsoring organization shall give each party a list of 11 arbitrators drawn from its panel of employment dispute arbitrators. Each party may strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual shall be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties shall strike names alternately from the list of common names until only one remains. The party who did not initiate the claim shall strike first. If no common name exists on the lists of all parties, the sponsoring organization shall furnish an additional list and the process shall be repeated. If no arbitrator has been selected after two lists have been distributed, then the parties shall strike alternately from a third list, with the party initiating the claim striking first, until only one name remains. That person shall be designated as the Arbitrator.

The Arbitrator shall apply the substantive law, (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator is without jurisdiction to apply any different substantive law, or law of remedies. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable. The arbitration shall be final and binding upon the parties, except as provided in this Agreement.

The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the Arbitrator deems necessary. The Arbitrator shall have the authority to entertain a motion to dismiss and/or a motion for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

3

Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of proceedings.

Either party, upon request at the close of hearing, shall be given leave to file a post-hearing brief. The time for filing such a brief shall be set by the Arbitrator.

The Arbitrator shall render an award and opinion in the form typically rendered in labor arbitrations.

Either party shall have the right, within 20 days of issuance of the Arbitrator's opinion, to file with the Arbitrator a motion to reconsider (accompanied by a supporting brief), and the other party shall have 20 days from the date of the motion to respond. The arbitrator thereupon shall reconsider the issues raised by the motion and, promptly, either confirm or change the decision, which (except as provided by this Agreement) shall then be final and conclusive upon the parties. The costs of such a motion for reconsideration and written opinion of the Arbitrator shall be borne by the party prevailing on the motion, unless the Arbitrator orders otherwise.

### Arbitration Fees and Costs

The Company and I shall equally share any filing fee and the fees and costs of the Arbitrator; provided, however, that my maximum contribution will be the lesser of (i) one week's pay at my regular base rate, or (ii) 10% of the amount in controversy. I understand that the Arbitrator has the authority upon motion to further reduce my share of the costs and fees upon a showing of substantial need. Each party will deposit funds or post other appropriate security for its share of the Arbitrator's fee, in an amount and manner determined by the Arbitrator, 10 days before the first day of hearing. Each party shall pay for its own costs and attorneys' fees, if any. However, if any party prevails on a statutory claim, which affords the prevailing party attorneys' fees, or if there is a written agreement providing for fees, the Arbitrator may award reasonable fees to the prevailing party.

### Judicial Review

Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Agreement and to enforce an arbitration award. A party opposing enforcement of an award may bring a separate action in any court of competent jurisdiction to set aside the award, where the standard of review will be the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury.

### Interstate Commerce

I understand and agree that the Company is engaged in transactions involving interstate commerce and that the Federal Arbitration Act applies to this Agreement.

4

### Requirements for Modification or Revocation

This Agreement to arbitrate shall survive the termination of my employment and the expiration of any benefit plan. It can only be revoked or modified by a writing signed by the parties, which specifically states an intent to revoke or modify this Agreement.

### Sole and Entire Agreement

This is the complete agreement of the parties on the subject of arbitration of disputes, except for any arbitration agreement in connection with any pension or benefit plan. This Agreement supersedes any prior or contemporaneous oral or written understandings on the subject. No party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth in this Agreement.

### Construction

If any provision of this Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, that provision shall be ineffective only to the extent of such unenforceability and shall not affect the validity of the remainder of the Agreement.

### Consideration

The promises by the Company and by me to arbitrate differences, rather than litigate them before courts or other bodies, provide consideration for each other.

### Not an Employment Agreement

This Agreement is not, and shall not be construed to create, any contract of employment, express or implied. Nor does this Agreement in any way alter the "at-will" status of my employment.

### Voluntary Agreement

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, THAT I UNDERSTAND ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE COMPANY AND ME RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT I HAVE ENTERED INTO THE AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR

Employee initials:
_L AP_

5

REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF.

I UNDERSTAND THAT BY SIGNING THIS AGREEMENT I AM GIVING UP MY RIGHT TO A JURY TRIAL.

I FURTHER ACKNOWLEDGE THAT I HAVE BEEN GIVEN THE OPPORTUNITY TO DISCUSS THIS AGREEMENT WITH MY PRIVATE LEGAL COUNSEL AND HAVE AVAILED MYSELF OF THAT OPPORTUNITY TO THE EXTENT I WISH TO DO SO.

| 10-12-04 | _Signature_ | Luis A. Phippard |
|---|---|---|
| Date | Signature of Employee | Printed Name of Employee |

| 10-12-04 | _Signature_ | Derek Holly |
|---|---|---|
| Date | Signature of Company Representative | Printed Name of Company Representative |

6



## <u>MUTUAL AGREEMENT TO ARBITRATE CLAIMS</u>

I recognize that differences may arise between E-Telecare and/or its related or affiliated companies or entities, and/or their predecessors or successors, including Integrated Telecom, LLC (collectively the "Company") and me during or following my employment with the Company, and that those differences may or may not be related to my employment. I understand and agree that by entering into this Agreement to Arbitrate Claims ("Agreement"), I anticipate gaining the benefits of a speedy, impartial dispute-resolution procedure.

Except as provided in this Agreement, the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Agreement. To the extent that the Federal Arbitration Act is inapplicable, California law pertaining to agreements to arbitrate shall apply.

I understand that any reference in this Agreement to the Company will be a reference also to its parent company, all of its subsidiary and affiliated entities, all benefit plans, the benefit plans' sponsors, fiduciaries, administrators, and affiliates, and all successors and assigns of any of them.

**Claims Covered by the Agreement**
The Company and I mutually consent to the resolution by arbitration of all claims or controversies ("claims"), past, present or future, whether or not arising out of my employment (or its termination), that the Company may have against me or that I may have against the Company or against its officers, directors, employees or agents in their capacity as such or otherwise. The only claims that are arbitable are those that, in the absence of this Agreement, would have been justiciable under applicable state or federal law. The claims covered by this Agreement include, but are not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant (express or implied); tort claims; claims for discrimination (including, but not limited to, race, sex, sexual orientation, religion, national origin, age, marital status, or medical condition, handicap or disability); claims for benefits (except claims under an employee benefit or pension plan that either (1) specifies that its claims procedure shall culminate in an arbitration procedure different from this one, or (2) is underwritten by a commercial insurer which decides claims); and claims for violation of any federal, state, or other governmental law, statute, regulation, or ordinance, except claims excluded elsewhere in this Agreement.

Except as otherwise provided in this Agreement, both the Company and I agree that neither of us shall initiate or prosecute any lawsuit or administrative action (other than an administrative charge of discrimination to the EEOC, California Department of Fair Employment and Housing, or similar fair employment practices agency, or an

eTelecare 0033

administrative charge within the jurisdiction of the National Labor Relations Board), in any way related to any claim covered by this Agreement.

## Claims Not Covered by the Agreement
Claims for workers' compensation or unemployment compensation benefits are not covered by this Agreement.

## Required Notice of All Claims and Statute of Limitations
The Company and I agree that the aggrieved party must give written notice of any claim to the other party no later than the applicable Statute of Limitations as may be prescribed by law.

Written notice to the Company, or its officers, directors, employees or agents, shall be sent to its President at 602 East Huntington Drive, Suite H, Monrovia, California 91016. I will be given written notice at the last address recorded in my personnel file.

The written notice shall identify and describe the nature of all claims asserted and the facts upon which such claims are based. The notice shall be sent to the other party by certified or registered mail, return receipt requested.

## Representation
Any party may be represented by an attorney or other representative selected by the party.

## Discovery
Each party shall have the right to take the deposition of one individual and any expert witness designated by another party. Each party also shall have the right to make requests for production of documents to any party. The subpoena right specified below shall be applicable to discovery pursuant to this paragraph. Additional discovery may be had only where the arbitrator selected pursuant to this Agreement so orders, upon a showing of substantial need.

## Designation of Witnesses
At least 30 days before the arbitration, the parties must exchange lists of witnesses, including any expert, and copies of all exhibits intended to be used at the arbitration.

## Subpoenas
Each party shall have the right to subpoena witnesses and documents for the arbitration.

## Arbitration Procedures
The arbitration will be held under the auspices of either the American Arbitration Association ("AAA") or Judicial Arbitration & Mediation Services, Inc. ("J· A· M· S"), with the designation of the sponsoring organization to be made by the party who did not initiate the claim.

eTelecare 0034

2

The Company and I agree that, except as provided in this Agreement, the arbitration shall be in accordance with the AAA's then-current employment arbitration procedures (if AAA is designated) or the then-current J· A· M· S employment arbitration rules (if J· A· M· S is designated). The arbitrator shall be either a retired judge, or an attorney licensed to practice law in the state in which the arbitration is convened (the "Arbitrator"). The arbitration shall take place in or near the city in which I am or was last employed by the Company.

The Arbitrator shall be selected as follows. The sponsoring organization shall give each party a list of 11 arbitrators drawn from its panel of employment dispute arbitrators. Each party may strike all names on the list it deems unacceptable. If only one common name remains on the lists of all parties, that individual shall be designated as the Arbitrator. If more than one common name remains on the lists of all parties, the parties shall strike names alternately from the list of common names until only one remains. The party who did not initiate the claim shall strike first. If no common name exists on the lists of all parties, the sponsoring organization shall furnish an additional list and the process shall be repeated. If no arbitrator has been selected after two lists have been distributed, then the parties shall strike alternately from a third list, with the party initiating the claim striking first, until only one name remains. That person shall be designated as the Arbitrator.

The Arbitrator shall apply the substantive law, (and the law of remedies, if applicable) of the state in which the claim arose, or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator is without jurisdiction to apply any different substantive law, or law of remedies. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable. The arbitration shall be final and binding upon the parties, except as provided in this Agreement.

The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes and is authorized to hold pre-hearing conferences by telephone or in person, as the Arbitrator deems necessary. The Arbitrator shall have the authority to entertain a motion to dismiss and/or a motion for summary judgment by any party and shall apply the standards governing such motions under the Federal Rules of Civil Procedure.

Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of proceedings.

Either party, upon request at the close of hearing, shall be given leave to file a post-hearing brief. The time for filing such a brief shall be set by the Arbitrator.

The Arbitrator shall render an award and opinion in the form typically rendered in labor arbitrations.

eTelecare 0035

Either party shall have the right, within 20 days of issuance of the Arbitrator's opinion, to file with the Arbitrator a motion to reconsider (accompanied by a supporting brief), and the other party shall have 20 days from the date of the motion to respond. The arbitrator thereupon shall reconsider the issues raised by the motion and, promptly, either confirm or change the decision, which (except as provided by this Agreement) shall then be final and conclusive upon the parties. The costs of such a motion for reconsideration and written opinion of the Arbitrator shall be borne by the party prevailing on the motion, unless the Arbitrator orders otherwise.

**Arbitration Fees and Costs**
The Company and I shall equally share any filing fee and the fees and costs of the Arbitrator; provided, however, that my maximum contribution will be the lesser of (i) one week's pay at my regular base rate, or (ii) 10% of the amount in controversy. I understand that the Arbitrator has the authority upon motion to further reduce my share of the costs and fees upon a showing of substantial need. Each party will deposit funds or post other appropriate security for its share of the Arbitrator's fee, in an amount and manner determined by the Arbitrator, 10 days before the first day of hearing. Each party shall pay for its own costs and attorneys' fees, if any. However, if any party prevails on a statutory claim which affords the prevailing party attorneys' fees, or if there is a written agreement providing for fees, the Arbitrator may award reasonable fees to the prevailing party.

**Judicial Review**
Either party may bring an action in any court of competent jurisdiction to compel arbitration under this Agreement and to enforce an arbitration award. A party opposing enforcement of an award may bring a separate action in any court of competent jurisdiction to set aside the award, where the standard of review will be the same as that applied by an appellate court reviewing a decision of a trial court sitting without a jury.

**Interstate Commerce**
I understand and agree that the Company is engaged in transactions involving interstate commerce and that the Federal Arbitration Act applies to this Agreement.

**Requirements for Modification or Revocation**
This Agreement to arbitrate shall survive the termination of my employment and the expiration of any benefit plan. It can only be revoked or modified by a writing signed by the parties which specifically states an intent to revoke or modify this Agreement.

**Sole and Entire Agreement**
This is the complete agreement of the parties on the subject of arbitration of disputes, except for any arbitration agreement in connection with any pension or benefit plan. This Agreement supersedes any prior or contemporaneous oral or written understandings on the subject. No party is relying on any representations, oral or written, on the subject of the effect, enforceability or meaning of this Agreement, except as specifically set forth in this Agreement.

4

## Construction

If any provision of this Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, that provision shall be ineffective only to the extent of such unenforceability and shall not affect the validity of the remainder of the Agreement.

## Consideration

The promises by the Company and by me to arbitrate differences, rather than litigate them before courts or other bodies, provide consideration for each other.

## Not an Employment Agreement

This Agreement is not, and shall not be construed to create, any contract of employment, express or implied. Nor does this Agreement in any way alter the "at-will" status of my employment.

## Voluntary Agreement

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, THAT I UNDERSTAND ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE COMPANY AND ME RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT I HAVE ENTERED INTO THE AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF.

Employee initials:
_____

I UNDERSTAND THAT BY SIGNING THIS AGREEMENT I AM GIVING UP MY RIGHT TO A JURY TRIAL.

I FURTHER ACKNOWLEDGE THAT I HAVE BEEN GIVEN THE OPPORTUNITY TO DISCUSS THIS AGREEMENT WITH MY PRIVATE LEGAL COUNSEL AND HAVE AVAILED MYSELF OF THAT OPPORTUNITY TO THE EXTENT I WISH TO DO SO.

| 4/19/04 | _Vickie Lindsay_ (signature) | Vickie Lindsay |
|---------|------------------------------|----------------|
| Date | Signature of Employee | Printed Name of Employee |

| _____ | _____ | _____ |
|------------------|------------------|------------------|
| Date | Signature of Company Representative | Printed Name of Company Representative |

5

eTelecare 0037

1

```
      86GAADREC                 Conference
1     UNITED STATES DISTRICT COURT
1     SOUTHERN DISTRICT OF NEW YORK
2     ----------------------ד--------x
2
3     JAMES DREYFUSS,
3
4               Plaintiff,
4
5          v.                         08 CV 1115 (RJS)
5
6     ETELECARE GLOBAL SOLUTIONS-US
6     INC.,
7
7               Defendant.
8
8     ------------------------------x
9                                    New York, N.Y.
9                                    June 16, 2008
10                                   11:00 a.m.
10
11    Before:
11
12                  HON. RICHARD J. SULLIVAN,
12
13                                   District Judge
13
14                       APPEARANCES
14
15    FEIN & JAKAB
15        Attorneys for Plaintiff
16    BY:  PETER JAKAB
16
17    LITTLER MENDELSON, P.C.
17        Attorneys for Defendant
18    BY:  ANDREW PAUL MARKS
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2.

86GAADREC                    Conference
1          (In chambers; telephone conference)
2          MR. JAKAB:  Peter Jakab and Andrew Marks.
3          THE COURT:  Hello, counsel.  It's Judge Sullivan.

Who

4    do we have on the line?
5          MR. WEISBERG:  Andrew Marks, for Etelecare.
6          THE COURT:  Good morning.
7          MR. JAKAB:  Peter Jakab from the Fein and Jakab firm
8    for the plaintiff.
9          THE COURT:  All right.  Mr. Jakab, good morning to
10   you.
11         I have a court reporter here so we're going to do

this

12   on the record and if you wouldn't mind, please, identify
13   yourself when you speak just so the court reporter can know

who

14   is speaking and make proper attributions.
15         All right.  I have received the letters that you've
16   sent me.  That is the June 4 letter for Mr. Jakab and the June
17   9 letter of Mr. Marks.  It sounds like at least one of the
18   requests has now been resolved.  That's the personnel file; is
19   that correct?
20         MR. MARKS:  I am willing to provide that.
21         THE COURT:  So, what we're talking about now is the
22   request of Mr. Jakab to have for me to order that defendants
23   produce all, basically, all employment and arbitration
24   agreements with employees between 2002 and 2004, correct?
25         MR. JAKAB:  Yes, the arbitration agreement and
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

3

86GAADREC                    Conference
1    clauses.
2          THE COURT:  Well, it would seem to me, I can see the
3    need for some discovery, but it would seem to me the discovery
4    ought to be limited to any agreement that tracks the language
5    of the pages that have been produced here as Mr. Dreyfus is.
6    Do you follow me?
7          MR. JAKAB:  Yes.  My intent would be to review all of
8    the agreements so that I can disprove this assertion in the

```
    9     defendant's motion to compel which is that if you look at the
   10     arbitration agreements from the time period, and they chose
the
   11     time period, they are a standard form and that that's the one
   12     that was in affect during that time period.  I would need to
   13     see all of the arbitration agreements or clauses from that
time
   14     period in order to be able to disprove that.
   15             THE COURT:  I'm not sure that anybody really cares --
   16     Well, I don't really care why they're standard or not
standard.
   17     What I care about is whether or not the two pages of the
   18     document that have been produced, and that no one disputes,
   19     were signed by the plaintiff in this case whether they're, in
   20     fact, is a form contract that that's connected to.
   21             MR. JAKAB:  As far as the argument on the motion goes
   22     I certainly agree with that.  What we do have here though is a
   23     record that the defendant has created that will be, perhaps,
   24     before your Honor, perhaps, before another court if there is a
   25     review, and that record is at the moment filled with evidence
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

4

```
          86GAADREC              Conference
    1     unilaterally chosen from a set of possible agreements by the
    2     defendant.  And it like in any evidentiary claim discovery is
    3     available to -- completeness and its veracity and the truth.
    4     And that's what I'd be looking to do is to respond in the
    5     record here with what would be my own analysis like the
    6     defendant has availed himself of the opportunity to do of the
    7     arbitration agreements and its files.
    8             THE COURT:  This is not full-blown discovery as
though
    9     we're proceeding here.  This is limited discovery for the
   10     purposes of resolving a motion before the Court.  So you may
be
   11     entitled to that broader discovery at a later date, but right
   12     now I only need some limited discovery to help me figure out
   13     whether there is a contract here and whether that contract
   14     includes a binding arbitration clause.  And if it does you can
   15     bet your buttons I am going to compel arbitration.  So that
   16     really is the issue.
   17             I am interested, and really I am the one who matters
   18     here, I am interested in seeing what contracts exist or
   19     agreements exist that track the language of that first page
```

and
20    the signature page that was signed by Mr. Dreyfus to see if
the
21    guts, the intervening pages vary from employee to employee,
22    which would give credence to the argument you are making,
23    Mr. Jakab. And if it turns out that, no, that the only
24    agreements that have the language of the first and last pages
25    all have the same intervening pages then I think it's harder
to

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

5

86GAADREC                    Conference
1    argue if there is no contract.
2         MR. JAKAB: I might say that the two agreements
3    submitted by the defendant already so far vary from each
other.
4         THE COURT: They vary from each other clearly. The
5    second one, that's the one that was signed by Cotter seems to
6    track the language of the Dreyfus agreement. Different font,
7    but it seems to track -- I mean, all the language that is in
8    Dreyfuss appears to be in the Cotter agreement. The Alvarado
9    one has a different language. There's portions that are
10   present in one that are not in the other.
11        MR. JAKAB: Exactly. And I would like the
opportunity
12   to show that there was no "standard" agreement that was being
13   handed out to all employees at the time. The record already
14   shows that in the sense of the two that have been submitted.
15   And if, in fact, there's even greater variation once the
16   universe of arbitration agreements is reviewed that would tend
17   to refute the defendant's argument that there was a standard
18   form and this is -- and that Mr. Dreyfus is just one of them
19   and they are sorry for having lost the pages.
20        THE COURT: Let me interrupt you and let me ask
21   Mr. Marks what the story is.
22        How broad is the discovery here? How many agreements
23   are we talking about? What is the universe?
24        MR. MARKS: We don't know yet but we have about, I
25   think it's about 20 employees who may have signed an
SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

6

86GAADREC                    Conference

1    arbitration agreement in that period whose files would be on
2    premises.  There are a number of our employees not active and
3    files may be else where.  With respect to being in storage
that
4    would have to be dug out and I don't know the exact number of
5    those persons.
6                THE COURT:  So, it's not terribly onerous if it's
only
7    20.
8                MR. MARKS:  It's not terribly onerous but I think
it's
9    red herring because I believed that the first and last page is
10   adequate to compel arbitration and whether the guts of that I
11   agreement say you go to Triple A or say something else, we
both
12   offer that because plaintiff has insisted upon needing that.
13   But your Honor is in power and is required to compel
14   arbitration, and if you don't find that we say how to go, your
15   article, the arbitration tells you to designate some
arbitrator
16   and then go that way.  And that arbitrator would say what are
17   my rules?  And then he would entertain this dispute as to what
18   the procedural aspects are.  But there's no dispute that he
19   signed an agreement to arbitrate this claim.  I don't know
what
20   we're looking at now with respect to 20, 40 or 60 other
21   agreements.
22                THE COURT:  I guess I am a little curious as to why
23   you felt the need to put in your own papers this line.
24                MR. MARKS:  I drafted that before.
25                THE COURT:  Here is the brief.  The brief says
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

7

86GAADREC                    Conference
1    Etelecare has provided unrefuted evidence that the arbitration
2    agreement plaintiff signed was the standard form mutual
3    agreement to arbitrate that was in effect in 2004 when
4    plaintiff executed his agreement.  So, that's your assertion.
5                MR. MARKS:  Yes, I know, an unnecessary one at that.
6    I know once we started to draft the brief after we were before
7    your Honor and you said we have to brief it we realized that
it
8    is not necessary to have that.  But those were offered to
9    plaintiff because he was complaining that he didn't know what

```
      10    he had agreed to, but that's why we did it.  May have been
      11    overkill.
      12            THE COURT:  But here is the issue.  The issue is are
      13    you suggesting that I should reserve on this request for
      14    discovery until after I've gotten the other brief and then can
      15    resolve this, perhaps, without any recourse to the additional
      16    discovery?
      17            MR. JAKAB:  I think we can obviate the need for any
of
      18    this discovery if the defendant will simply remove this
      19    argument and these two documents, or I guess it's four
      20    documents, from the record and then I will withdraw my request
      21    for this discovery.  If everybody the court the defendant,
      22    certainly me, thinks that this is an unnecessary argument
      23    extraneous overkill let's just take it out of the record,
      24    proceed with the motion without it and then I won't need any
of
      25    this discovery.
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300


8

```
              86GAADREC              Conference
      1             THE COURT:  What do you say to that, Mr. Marks?
      2             MR. MARKS:  Well, you know, your Honor, I want to
make
      3     sure that you have comfort level that there is an agreement
      4     here.  So, I you want it to be a complete agreement.  So, we
      5     did import the pages.  We did have it in his file.  I'll
      6     produce some other agreements just so you know that we're not
      7     blowing smoke.  And I don't know that we said identical, but
      8     there was a standard form agreement being used and I don't
have
      9     a problem for producing some of those.  To go through all of
      10    them though I think might be a little bit much but I'll
produce
      11    them.
      12            MR. JAKAB:  I'm afraid with that kind of language I'm
      13    going to get looks that are similar.  I need to be able to
vent
      14    these things not defense counsel.
      15            MR. MARKS:  I'm not sure why that is.  If we had ten
      16    other ones that are the same, what difference would it make if
      17    others were different?  There's no argument that he entered
      18    into a different agreement.  There is argument that this is
the
```

```
19   standard agreement we were using.  So there might have been
20   others, but so what?  Individually negotiated, so what?  What
21   would that establish if someone else said, no, I don't want to
22   have this agreement?  Your client didn't do that.  Your client
23   sent back the signature page and that front page.  Your client
24   conducted that.
25           THE COURT:  This is supposed to be an argument to me,
```

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

9

86GAADREC                   Conference

```
1    not to each other.
2            MR. JAKAB:  The standard agreement means there was
```
one
```
3    form of agreement.  It was conditioned of your employment like
4    they argue that it was, and if it turns out that when I see
```
all
```
5    of the agreements from this period and that to me at this
```
point
```
6    it very much sounds like defendant is going to great lengths
```
to
```
7    hide some of them, actually, all of them, and they're all over
8    the place or there are some that are same, some that are
9    different.  I think the obvious difference from that is that
10   there is no standard form and there is no reason to think that
11   any particular one conformed to any kind of standards since
12   there was no standard and that would mean that you can't
13   import, as they say, provisions from other agreements into one
14   agreement because there's no basis for it.
15           MR. MARKS:  I am not going to great lengths to hide
16   anything.  I haven't read the agreement so there would be no
17   reason for me to hide anything.  I could have just removed it
18   and not put them in.  So, frankly, I am a little taken aback
```
by
```
19   such an argument.  Again, none of that portion are necessary.
20   I offered them only because you wanted to have some procedure
21   in terms of the settlement and the proposal, so that's why I
22   offered it.  I'll produce more.  I'll produce the active
23   employees.
24           THE COURT:  How many active are there and how many --
25           MR. MARKS:  I don't know how many inactive.  There
```
are

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

10

86GAADREC                    Conference
1    like 20 active employees.
2              MR. JAKAB:  I very much, this is how we got here
today
3    is with defense counsel going to vet what the Court gets to
4    see.  That's really not how it's supposed to work.  It's
5    supposed to be that discovery get's me on the arbitration
6    agreements only.  All documents that are likely to lead to the
7    discovery of admissible evidence.  Defense counsel is going to
8    pick and choose which ones to produce.
9              THE COURT:  Again, you are stating a standard for
10   discovery in a civil litigation.  This is discovery for the
11   limited purpose of determining whether or not there is a
12   binding arbitration agreement.  So it doesn't entitle you to
13   the sort of discovery you would be entitled to get.
14             MR. JAKAB:  Certainly not.
15             THE COURT:  At the early stages of a regular civil
16   litigation.  Look.  I think the way to go is this, I think,
Mr.
17   Marks, you should produce all of the active files just because
18   that's a nice easy line to draw.  If it's about 20 that gives
19   Mr. Jakab something.  Mr. Jakab, that should be enough for you
20   to address the arguments set forth in really a page and a half
21   of the brief.  If you feel you need more then you can make a
22   request for more, but I think since it's arguably a peripheral
23   argument in any event, I don't think we should spend too much
24   time on this.
25             Mr. Marks if you in the course of fishing through all
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

11

86GAADREC                    Conference
1    these documents decide that you just assume withdraw that
2    portion of your brief because it is a sideshow then you can
let
3    me know that, but otherwise how much time do you need to
4    produce these agreements?
5              MR. MARKS:  We're working on it.  Maybe like a week
or
6    two.  I don't see why we need more than that.  Let me just be
7    clear cause I don't mean to have misstated anything.  There's
8    29 employees who could have had these agreements.  I don't
know
9    that they all had arbitration agreements.  If we look at all

```
10   the files and they don't have an arbitration agreement, there
11   isn't one.  If I see the numbers there's 115 people hired in
12   that timeframe.  So there would have been whatever that is 90,
13   115 minus 29 people who are in storage.  So we will go from
```
the
```
14   29 which we will do and I'll let plaintiff's counsel know what
15   agreements there or not and we'll go forward from there.  May
```
I
```
16   redact salaries and stuff?  Do you need to offer letters by
```
the
```
17   way?
18             THE COURT:  You can't talk over each other.  What is
19   the question you were asking, Mr. Marks?
20             MR. MARKS:  I asked if the offer letters which are
21   more likely to contain salaries are necessary I'm not sure of
22   the relevance of those.
23             THE COURT:  Mr. Jakab, do you feel you need the offer
24   letters?
25             MR. JAKAB:  Your Honor, from the offer letters they
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

12

```
     86GAADREC                  Conference
 1   make this argument that it was a condition of everybody's
 2   employment.
 3             MR. MARKS:  Well, I am not sure I said that.  I may
 4   have but it's an overstatement too.  It's a condition of his
 5   employment.
 6             THE COURT:  And the fact it is I just want to know
 7   whether Mr. Dreyfuss signed this agreement, whether it's
 8   binding agreement and if it's a standard form agreement I'd
 9   like to see the agreement that is the standard form.
10             MR. JAKAB:  The way I say it is whether the defendant
11   has met its burden on this motion of putting forward an
12   agreement at all and all of its terms and (inaudible) that is
13   the burden that the defendant carries and he's either going to
14   meet that burden or then I have to overcome and --
15             MR. MARKS:  I don't know.
16             MR. JAKAB:  The point for this call is that one way
17   it's trying to meet that burden is to fill in what's missing
18   with this standardness argument and that's what I'm looking
19   test and the standardness argument is hooked in with the offer
20   letters and from that they argue is the condition to
21   everybody's employment.  So if there is no arbitration
22   agreement for some number of the employees then that would
```

23    continued to refute the argument that it's condition of
24    everybody's employment. If the condition does not appear in
25    some number of the employee's offer letter that would clearly
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

86GAADREC                    Conference
1    refute the argument that it's a condition of everybody's
2    employment.
3              THE COURT: Why do I care whether it's a condition of
4    everybody's employment?
5              MR. JAKAB: If your Honor does not care I'd be
pleased
6    to stipulate to striking that portion of the arguments from
7    this record and then I won't need to address them in any way.
8              THE COURT: That doesn't strike me as relevant to the
9    issues before the Court on this motion.
10             MR. JAKAB: I appreciate that and I appreciate your
11   Honor's statement of that. And if we can get that out of the
12   record I won't have to do any of this.
13             MR. MARKS: I don't think I made the argument it's
14   conditioned of everybody's employment. I made the argument
15   it's a condition of his employment cause in his offer letter
16   it's (inaudible) to sign (inaudible) which he did.
17             I know this is not time to argue the merits but I
must
18   state that I think your idea of what I need to prove is
19   incorrect. I need to prove that he signed an agreement to
20   arbitrate claims which I have done by his own document. I
21   don't need to prove that there's completer agreement because
22   that would be for the arbitrator to decide.
23             So, just to cut this short I am happy to look at the
24   29 agreements and produce those. I will send this personnel
25   file so I can send that today.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

86GAADREC                    Conference
1              THE COURT: Let's get to that. I'm anxious to get to
2    this on the merits. I think this is a bit of a sideshow at
3    least from what I've read in the opening brief. Now, what
does
4    this mean for the schedule, the briefing schedule?
5              MR. JAKAB: If we set a date for the production of

6    these documents I'd ask for I have four weeks to respond.  I'd
7    have ask to reserve three of those.
8         MR. MARKS:  You could draft this stuff and leave that
9    paragraph empty.  I have a paragraph in a half in my papers.  I
10   don't know why this should throw off the whole schedule.
11        THE COURT:  I agree.  I'm not inclined to give you an
12   extra three or four weeks.  I may give you an extra week after
13   you get the materials for that portion of the brief, but even
14   that's generous.
15        MR. JAKAB:  I'd ask for two.
16        THE COURT:  Two weeks after you get these materials?
17        MR. JAKAB:  I really don't know what's going to be in
18   the material, like I didn't know what was going to be in the
19   motion.
20        THE COURT:  I understand that, but it is not going to
21   be going to be that voluminous.  What is the schedule that
22   we've previously set?  I am just looking here.  When were your
23   papers otherwise due, Mr. Jakab?
24        MR. JAKAB:  I'm sorry, your Honor, but I don't have my
25   calendar with me.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

15

     86GAADREC               Conference
1         MR. MARKS:  I think --
2         THE COURT:  I have it here.
3         MR. MARKS:  -- sometime in August.
4         THE COURT:  No.  I think initially --
5         MR. JAKAB:  I believe my papers were due near the end
6    of June.
7         THE COURT:  Yes, June 24.  And then a reply which is
8    going to be a few days later on the 27.  So when do you
9    think --
10        MR. MARKS:  I thought it was a longer period of time.
11   I know I have been working on it.  I e-mailed her yesterday and
12   Friday because I wanted to know what the burden would be.  She
13   hasn't gotten back to me.  I could aim to have this stuff by
14   the end of this week, certainly.
15        THE COURT:  All right.  Well, if you can get it by the
16   end of this week then that would be the 20th.
17        MR. MARKS:  Yes.

        18          THE COURT:  So then, I'll adjust the schedule so
that,
        19   Mr. Jakab, your materials then are due, I'll make it due July
        20   9th; is that all right?
        21          MR. JAKAB:  Thank you, your Honor.
        22          THE COURT:  Because of the holiday.  All right.  And
        23   then, Mr. Marks, then I'll give you a week.
        24          MR. MARKS:  Okay.
        25          THE COURT:  Just a little more than what I have given
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

16

             86GAADREC              Conference
        1    you but just so everybody feels they've gotten an adequate
shot
        2    to make their arguments so July 16.
        3          MR. JAKAB:  Your Honor, just to be clear about what's
        4    going to be produced and in what form, I understand about the
        5    29 documents and in the event that there is no arbitration
        6    agreement in the third to last paragraph in my letter stating
        7    what I need to make these things admissible; any objection to
        8    that?
        9          MR. MARKS:  If I produce them to you I don't have a
        10   problem.  I am not going to contest that.
        11         MR. JAKAB:  So we stipulating to their admissibility.
        12         (Speaking at the same time)
        13         MR. MARKS:  No providing that?  No, I am going to
        14   produce the 29 agreements and you can attach them to your
        15   motions.  I won't contest the fact that they came from our
        16   records.
        17         THE COURT:  The one, two, three, four are basically
        18   designed so that you can get them in as admissible.
        19         MR. JAKAB:  Avoid the need for custodian of record
        20   deposition.
        21         THE COURT:  As long as there's representation that
for
        22   purposes of this motion these materials are admissible and may
        23   be considered as authentic documents of the company, I don't
        24   see that there's a problem.  Do you?
        25         MR. JAKAB:  Okay.  I'll accept that, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

17

             86GAADREC              Conference

```
 1              THE COURT:  So, if there's a problem that arises from
 2    that because of the representations being made then you'll let
 3    me know.  All right.  I'll issue a short order that clarifies
 4    all of this.
 5              MR. MARKS:  Thank you.  Do we come somewhere with the
 6    offer letters?  Is that not necessary?
 7              THE COURT:  I don't think the offer letters are
 8    necessary.  I think whether it was standard that it was a
 9    condition of employment is not relevant to this case.
10              MR. MARKS:  Thank you very much, your Honor.
11              THE COURT:  Thank you, both.  Good bye.
12                            o 0 o
13
14
15
16
17
18
19
20
21
22
23
24
25
```


**telecare**
GLOBAL SOLUTIONS

August 4, 2006

Dear Jamie Dreyfuss:

As discussed during our Sales and Marketing meeting in December 2005 and during subsequent meetings with you, eTelecare is implementing the following new 2006 incentive bonus program.

All previous commission, compensation, bonus or individual agreements, understandings, arrangements and plans are terminated as of January 1, 2006. However, eTelecare has decided that it will make compensation payments to you for the new programs (see Exhibit A for new program definition) that are credited to you and go "live"[1] in calendar year 2006 and for pre-2006 programs (as determined by eTelecare) that are credited to you (the 2006 programs and the pre-2006 programs, together, the "Programs"), based on the following:

- For the period January 1, 2006 to March 31, 2006, subject to the conditions and limitations set forth below, (i) bonus payments (if any) based on Call Handling Revenues[2] will be determined based on the rates set forth in your current compensation arrangement, and (ii) bonus payments (if any) based on Training Revenues[3] will be determined based on the rates as described in Exhibit B.1.
- Effective for the subsequent quarters (including the quarter beginning on April 1, 2006), subject to the conditions and limitations set forth below, (i) bonus payments (if any) based on Call Handling Revenues will be determined based on the rates described in Exhibit B.2, and (ii) bonus payments (if any) based on Training Revenues will continue to be determined based on the rates as described in Exhibit B.1. For back office, chat, email or other unique programs in 2006, bonus payments (if any) will be determined on an individual basis and will be conditioned on formal documented management approval.
- Bonus payments will be determined based on the foregoing (subject to the conditions and limitations set forth below) until the second anniversary of the "live" date of the relevant Program (with respect to any relevant Program that went "live" prior to 2006, the second anniversary of the Program's start date determined by eTelecare's revenue recognition policies) or your employment termination, whichever first occurs. There will be no bonus with respect to a Program after the second anniversary of the Program's "live" date or your employment termination, whichever first occurs. For avoidance of any doubt, with respect to any relevant Program that went "live" prior to 2006, if the second anniversary of the Program's start date already passed as determined by eTelecare, there will be no bonus with respect to such Program.

Corporate
602 E Huntington Dr
Suite H
Monrovia, CA 91016
v.626.256.7560
f. 626.256.7565

United States
5901E Raintree Dr
Suite 100
Scottsdale, AZ 85260
v.480.951.6390
f. 480.951.6395

Philippines
Citibank Square
20' Floor
Eastwood Cyberpark
Eaguinbayan,
Quezon City
Manila, Philippines
v.63(2)916.5670
f. 63(2)916.2200

www.eTelecare.com

---

1 A program goes "live" by eTelecare's formally commencing outbound or inbound call activities, data entry or back office activities (in any case, other than for training purposes), or handling live client traffic in the production environment, that are contracted under the program, as reflected in eTelecare's invoice records. The going "live" date of a program is not changed by enhancements or extensions to the program, creation of additional revenue opportunities within that program, or other related activities or campaigns, unless such enhancements or activities are (i) classified as new programs by the CEO in his or her sole discretion, and (ii) communicated as such in writing to you by the Senior Vice President of Sales & Marketing.

2 Call Handling Revenue: Collected revenue associated with eTelecare agents handling specific transactions on behalf of client, as determined by eTelecare's revenue recognition policies.

3 Training Revenue: Collected revenue associated with training classes attended by eTelecare agents, as determined by eTelecare's revenue recognition policies.

LEGAL_US_W # 53373540.18

- In each calendar quarter, if you fulfill your duties and responsibilities as a Regional Vice President, you will be eligible to earn a bonus that will be based on the Programs' collected revenues attributed to the quarter; provided the Programs generated billed revenues during the quarter. If and when the billed revenues are collected, you will earn 100% of the bonus (as determined according to the foregoing) that is based on the Programs' collected revenues attributed to the quarter.

- However, while waiting for the billed/invoiced revenues to be collected, eTelecare will make reasonable efforts to provide you with a bonus advance (Bonus Advance) based on the Program's billed revenues during the quarter. The Bonus Advance is an advance against the bonus described above. eTelecare will reasonably attempt to pay the Bonus Advance by no later than 30 days after the end of the calendar quarter.

- The Bonus Advance payment will completely satisfy eTelecare's obligations with respect to the bonus you earn. If the actual bonus amount earned is less than the Bonus Advance (determined without regard to any adjustments from any prior quarters), the difference will be applied to reduce any Bonus Advances in subsequent quarters. If the actual bonus amount earned is greater than the Bonus Advance (determined without regard to any adjustment from any prior quarters), eTelecare will reasonably attempt to pay you the difference no later than the date the next quarterly bonus payout is made.[4]

- If your employment with eTelecare terminates, your bonus (if any) will be handled as follows:
    o Voluntary separation – Your bonus for the quarter in which you leave eTelecare will be determined based on the revenues for billable Program activities collected up to and including your employment termination date (Final Bonus). eTelecare will reasonably attempt to pay you your Final Bonus as soon as administratively practicable after your last day of employment but no later than 2 ½ months following the end of the calendar quarter in which the employment termination occurs. You will not be entitled to any additional bonus for any revenue (for any Program activities) invoiced or collected after your termination date. Also, if you received any Bonus Advance for any prior quarter that has not been reconciled with the actual earned bonus for such quarter:
        ▪ If the actual bonus amount earned is less than the Bonus Advance (determined without regard to any adjustment from any prior quarters), the difference will be applied to offset any Final Bonus.
        ▪ If the actual bonus amount earned is greater than the Bonus Advance (determined without regard to any adjustment from any prior quarters), the difference will be added to the Final Bonus.
    o Inter-department transfer – If you decide to transfer to another group and/or position within eTelecare, the bonus for the quarter in which the transfer occurs (if any) and all future bonuses (and any related bonus advances), if any, will be separately negotiated on a case by case basis.
    o Involuntary separation due to cause – You will not receive any bonus or Bonus Advance for the quarter in which the employment termination occurs. You will not be entitled to any bonus for any revenue (for any Program activities) invoiced or collected after your termination date. If you received any Bonus Advance for any prior quarter that has not been reconciled with the actual earned bonus for such quarter:
        ▪ If the actual bonus amount earned is less than the Bonus Advance (determined without regard to any adjustment from any prior quarters), the difference will be applied to offset any compensation eTelecare might owe you.

---

4 However, with respect to the 4th quarter of the calendar year, eTelecare will reasonably attempt to pay you the difference no later than 2½ months following the end of the quarter or as soon as administratively practicable thereafter.

- If the actual bonus amount earned is greater than the Bonus Advance (determined without regard to any adjustment from any prior quarters), eTelecare will pay you the difference.
  - ○ Involuntary separation without cause or due to disability – You will receive a bonus for revenue collected during a certain period following your last day of employment (Post-Termination Period); provided that the revenue is from services provided for your bonus-eligible Programs. The Post-Termination Period (which may be zero (0) day) will be determined on a case-by-case basis with final decision by the CEO and/or SVP of Sales & Marketing. eTelecare will reasonably attempt to pay you your bonus as soon as administratively practicable after the Post-Termination Period but no later than 2 ½ months following the end of the calendar quarter in which the Post-Termination Period ends. You will not be entitled to any additional bonus for any revenue (for any Program activities) invoiced or collected after the Post-Termination Period. If you received any Bonus Advance for any prior quarter that has not been reconciled with the actual earned bonus for such quarter, the difference between the Bonus Advance and the actual earned bonus shall be handled in the same way as described under "Voluntary separation" above.

The aforementioned compensation arrangement will not be applicable to any programs that are credited to you or go "live" after the end of calendar year 2006.

As discussed with you over the last couple of months, eTelecare will also implement a new 2006 quota bonus program. The period for which the new quota program will be in effect is from January 1, 2006 through December 31, 2006. At the end of calendar year 2006, the new quota program will automatically terminate, and thereafter eTelecare will have no obligation to compensate you in accordance with such quota program. This new quota program will supersede all previous individual quota agreements, understandings, arrangements and plans that you had. Consequently, all such individual quota agreements, understandings, arrangements and plans (including Quota Attainment Bonus, Q1 Early Attainment Accelerator and Balanced Quarterly Revenue Bonus and other quota related bonus) are terminated as of January 1, 2006.

The following is a brief preview of the current plans for the new 2006 quota bonus program:

- After the end of calendar year 2006, eTelecare will determine the total Sales of Net New Programs (defined in attached Exhibit C) in calendar year 2006 credited to you.
- If your total Sales of Net New Programs in calendar year 2006 meets or exceeds Trigger 1 (see Exhibit C) but is less than Trigger 2 (see Exhibit C), subject to the conditions and limitations set forth below, your 2006 quota bonus (if any) will be your total Sales of Net New Programs multiplied by 1%.
- If your total Sales of Net New Programs in calendar year 2006 meets or exceeds Trigger 2, subject to the conditions and limitations set forth below, your 2006 quota bonus (if any) instead will be your total Sales of Net New Programs multiplied by 1.25%.
- However, Trigger 1 and 2 will become applicable (i.e., you will be eligible to earn a quota bonus under the 2006 quota bonus program) only if in calendar year 2006 you sell eTelecare services to at least 1 net new client that is projected to generate full year annual revenue of at least $6M for eTelecare (as determined by eTelecare in accordance with its revenue recognition policies).
- If your total Sales of Net New Programs in calendar year 2006 is less than Trigger 1, you will not earn any quota bonus.
- Payment of any 2006 quota bonus will be subject to your continued employment with eTelecare through the quota bonus payout date. You must be an active employee at the time of payout to be eligible to receive your quota bonus. eTelecare will reasonably attempt to pay you your quota bonus within 1 month

after the end of calendar year 2006 but no later than the end of calendar year 2007 (the actual payout date, the "quota bonus payout date").

As always, eTelecare reserves the right to modify or terminate your compensation arrangements, including the arrangements set forth in this letter (i.e., the 2006 incentive bonus program and the 2006 quota bonus program) at any time in its sole discretion. Any new/modified compensation plan will not apply to prior periods and will only become effective as of the date the new/modified compensation plan specifies (which will be no earlier than the beginning of the quarter in which any such plan is widely communicated to the affected employees).

If the understandings stated in this letter are agreeable to you, please sign below, keep one copy and return the original to me.  Please feel free to contact me if you have any questions or concerns.

Sincerely,

eTelecare Global Solutions, Inc.

By:_____          Accepted:_____
**Glenn Dispenziere**                                    Name:
Sr. V.P. of Sales & Marketing                         Date:

## Exhibit A

## New Program Definition

The following criteria are the primary guidelines for determining if the opportunity is a new client and/or a new program:

### 1. New Client
Factors considered when determining if it is a New Client include:
a. Separate Corporate Subsidiary
b. Separate Corporate Headquarters
c. Different SIC code
d. Separate Call Centers (managed uniquely)
e. Different Website
f. Different Branding

### 2. New Program
Primary factor used to determine if it is a New Program is:
a. Different set of agents/ different queue to handle calls

Other factors that will be considered include:
a. Formal RFP Process
b. Separate SOW from previous programs
c. New client decision-maker (e.g., new client business unit)
d. Separate Client Manager (CM)
e. Unique program-specific scorecard and/or metrics
f. Run as a separate program in operations

Programs that are migrated from the US operations to non-US operations will be considered a net new program and the program start date will be defined as the go-live start date for the non-US operations.

While not an exhaustive list or criteria, a program will NOT be considered new if:
- On OB sales program it is the same group of agents on a new OB campaign and/or new list
- On IB sales program if it is the same group of agents handling an additional campaign

The final decision for identifying a new program rests with the CEO, who has final say regardless of any specific program characteristics notwithstanding the foregoing.

**Exhibit B.1.**

**Bonus Payments for Training Revenues**

Calculation Steps:
1. Hourly Rate for Training Revenues is calculated by dividing billable training revenues by billable training hours.
2. Bonus Rate for Training Revenues is determined by the Hourly Rate for Training Revenues as listed in Table A and Table B.
3. Time-Span Factor for bonus payments is determined as per Table C.
4. Bonus payment for Training Revenues is calculated by multiplying a) Training Revenues and b) Bonus Rate for Training Revenues and c) Time-Span Factor.

**Table A: Bonus Rates for Training Revenues from US Operations**

| Hourly Rate | Bonus Rate |
|---|---|
| Less than $10/hr | 0% |
| More than or equal to $10/hr but less than $14/hr | 1% |
| More than or equal to $14/hr but less than $16/hr | 2% |
| More than or equal to $16/hr but less than $18/hr | 3% |
| More than or equal to $18/hr | 4% |

**Table B: Bonus Rates for Trainng Revenues from non-US Operations**

| Hourly Rate | Bonus Rate |
|---|---|
| Less than $6/hr | 0% |
| More than or equal to $6/hr but less than $8/hr | 1% |
| More than or equal to $8/hr but less than $10/hr | 2% |
| More than or equal to $10/hr but less than $12/hr | 3% |
| More than or equal to $12/hr | 4% |

**Table C: Time-Span Factor**

| Time since start or live date (as applicable) of a program | Time-span Factor |
|---|---|
| 1 - 12 months | 1 |
| 13 - 24 months | 2/3 |
| 25 months or more | 0 |

## Exhibit B.2.

### Bonus Payments for Call Handling Revenues

Definitions and Calculation Steps:

1. Bonus Revenue is equal to Collected Revenue amount less outbound telecom charges and any other out of pocket, pass through expenses and sales discounts (if any), as determined by eTelecare's revenue recognition policies.
2. Outbound telecom charges are equal to $1/hour x outbound talk hours (if outbound talk hours are not readily available then a reasonable % of production hours, as determined by eTelecare's revenue recognition policies, will be used as an approximation for talk hours).
3. Hourly Rate for Bonus Revenues is equal to Bonus Revenue divided by hours billed to the client.
4. Bonus Rate is determined by matching the calculated Hourly Rate to the appropriate rate lookup table (Table A, B, or C) based on the type of program (Labor Hour Based, Production Hour Based, Billable Minute based).
5. Time-Span Factor for bonus payments is determined as per Table D.
6. Bonus payment for Call Handling Revenues is calculated by multiplying a) Bonus Revenues and b) Bonus Rate and c) Time-Span Factor.
7. Program Type Definitions
   a. Labor Hour Based Program – eTelecare bills the client for all time the agent is logged into the time keeping system which only excludes lunch and formal training (which is billed separately to the client).
   b. Production Hour Based Program – eTelecare bills the client for all the time the agent is logged into the switch available to handle customer interactions.
   c. Billable Minute Based Program – eTelecare bills the client only for actual time spent on customer interactions or completing after call work.

**Table A:**

| Pricing: Labor Hour (Paid Hours) Basis | | | |
|---|---|---|---|
| LH | | | |
| | | | |
| Region: US (Labor Hour Revenues) | | | |
| | Hourly Rate (More than or equal to) | Hourly Rate (Less than) | Bonus Rate |
| | $ - | $ 22.00 | 0% |
| | $ 22.00 | $ 26.00 | 0.75% |
| | $ 26.00 | $ 29.00 | 1% |
| | $ 29.00 | $ 33.00 | 2% |
| | $ 33.00 | $ 40.00 | 3% |
| | $ 40.00 | $ 44.00 | 4% |
| | $ 44.00 | | 4.50% |
| | | | |
| Region: Outside US (Labor Hour Revenues) | | | |
| | Hourly Rate (More than or equal to) | Hourly Rate (Less than) | Bonus Rate |
| | $ - | $ 10.25 | 0% |
| | $ 10.25 | $ 12.00 | 2% |
| | $ 12.00 | $ 14.75 | 3% |
| | $ 14.75 | | 4% |

**Table B:**

| Pricing: Production Hour (Logged Hours) Basis | | | |
|---|---|---|---|
| PRH | | | |
| | | | |
| Region: US (Production Hour Revenues) | | | |
| | Hourly Rate (More than or equal to) | Hourly Rate (Less than) | Bonus Rate |
| | $              - | $    25.50 | 0% |
| | $      25.50 | $    30.25 | 0.75% |
| | $      30.25 | $    33.75 | 1% |
| | $      33.75 | $    38.25 | 2% |
| | $      38.25 | $    46.50 | 3% |
| | $      46.50 | $    51.00 | 4% |
| | $      51.00 | | 4.5% |
| | | | |
| Region: Outside US (Production Hour Revenues) | | | |
| | Hourly Rate (More than or equal to) | Hourly Rate (Less than) | Bonus Rate |
| | $              - | $    12.00 | 0% |
| | $      12.00 | $    14.00 | 2% |
| | $      14.00 | $    17.00 | 3% |
| | $      17.00 | | 4% |

**Table C:**

| Pricing: Billable Minute Basis | | | |
|---|---|---|---|
| PM | | | |
| | | | |
| Region: US (Billable Minute Revenues) | | | |
| | Per Minute Rate (More than or equal to) | Per Minute Rate (Less than) | Bonus Rate |
| | $              - | $    0.50 | 0% |
| | $      0.50 | $    0.60 | 0.75% |
| | $      0.60 | $    0.65 | 1% |
| | $      0.65 | $    0.75 | 2% |
| | $      0.75 | $    0.90 | 3% |
| | $      0.90 | $    1.00 | 4% |
| | $      1.00 | | 4.50% |
| | | | |
| Region: Outside US (Billable Minute Revenues) | | | |
| | Per Minute Rate (More than or equal to) | Per Minute Rate (Less than) | Bonus Rate |
| | $              - | $    0.25 | 0% |
| | $      0.25 | $    0.30 | 2% |
| | $      0.30 | $    0.35 | 3% |
| | $      0.35 | | 4% |

**Table D: Time-Span Factor**

| Time since start or live date (as applicable) of a program | Time-span Factor |
|---|---|
| 1 - 12 months | 1 |
| 13 - 24 months | 2/3 |
| 25 months or more | 0 |

**Exhibit C**

**2006 Quota Bonus Program**

| Item | Amount/Target | Definitions/Notes |
|---|---|---|
| Trigger 1 | $3,000,000 | Determined by Sales of Net New Programs by you in calendar year 2006. Can be from an existing client or new client. |
| Trigger 2 | $5,000,000 | Determined by Sales of Net New Programs by you in calendar year 2006. Can be from an existing client or new client. |
| | | However, Trigger 1 and 2 will become applicable (i.e., you will be eligible to earn a quota bonus under the 2006 quota bonus program) only if in calendar year 2006 you sell eTelecare services to at least 1 net new client that is projected to generate full year annual revenue of at least $6M for eTelecare (as determined by eTelecare in accordance with its revenue recognition policies). |
| | | |
| Net New Programs | | Net New Programs are programs for which the service contracts (MSA and/or SOW) go "live" in calendar year 2006.  Sales of Net New Programs will be determined by eTelecare in accordance with its revenue recognition policies. |
| | | |
| Quota bonus for meeting or exceeding Trigger 1, but not meeting or exceeding Trigger 2 | 1.00% | Quota bonus is calculated by multiplying this rate by Sales of Net New Programs (less of unpaid outbound long distance telecom costs, pass through expenses and any out of pocket expenses, as determined by eTelecare's revenue recognition policies) in calendar year 2006. However, if Trigger 2 is met or exceeded then quota bonus for the entire Sales of Net New Programs (less of unpaid outbound long distance telecom costs, pass through expenses and any out of pocket expenses, as determined by eTelecare's revenue recognition policies) will instead be determined based on the Trigger 2 rate below and the Trigger 1 rate will be disregarded. |
| Quota bonus for meeting or exceeding Trigger 2 | 1.25% | Quota bonus is calculated by multiplying this rate by the entire Sales of Net New Programs (less of unpaid outbound long distance telecom costs, pass through expenses and any out of pocket expenses, as determined by eTelecare's revenue recognition policies) in calendar year 2006.  The Trigger 1 rate above is disregarded. |