UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

No. 08 Civ. 1115 (RJS)

———————————

JAMES DREYFUSS,

Plaintiff,

VERSUS

ETELECARE GLOBAL SOLUTIONS-US, INC.,

Defendant.

———————————

MEMORANDUM AND ORDER
September 30, 2010

———————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff James Dreyfuss brings this diversity action against Defendant eTelecare Global Solutions-US, Inc., alleging violations of New York Labor Law and breach of contract, as well as other common law claims.

Now before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Court grants Plaintiff's motion for partial summary judgment as to liability but denies it with respect to damages. Additionally, the Court grants in part and denies in part Defendant's motion for summary judgment.

I. BACKGROUND

A. Facts[1]

Defendant operates in the field of "business process outsourcing," an industry that enables corporations to "outsource" various customer service responsibilities. (Pl.'s 56.1 ¶ 1; Compl. ¶ 4.)[2] Defendant

---

[1] Except as otherwise noted, the following facts are taken from the parties' Local Rule 56.1 Statements and exhibits submitted in connection with the motions. When only one party's Rule 56.1 Statement is cited, the opposing party does not dispute that fact or has offered no admissible evidence to controvert it.

[2] Throughout this opinion, the Court refers to Plaintiff's and Defendant's Local Rule 56.1 Statements as "Pl.'s 56.1" and "Def.'s 56.1." The

provides its corporate clients with employees trained to perform a multitude of tasks, such as technical support, warranty support, and sales. (Compl. ¶ 4.) Throughout their papers, the parties refer to the outsourcing services that Defendant supplies its clients as "programs."

Because of the nature of Defendant's business, there is a significant delay between when one of Defendant's salespersons starts attempting to sell a program to a client and when, if the program is sold, the program becomes implemented. Typically, it takes one of Defendant's salespersons between six and eighteen months to sell a program to a client. (Pl.'s 56.1 ¶ 2.) After the sale, Defendant needs between three and six months to implement an average-size program. (*Id.* ¶ 3.)

In March 2004, Defendant offered Plaintiff a job as the Regional Vice President of Sales for the Northeast region. (Malik Decl., Ex. B.; Def.'s 56.1 ¶ 1.) Plaintiff's offer letter included the terms of his employment, and a separate document — entitled a "compensation summary" — explained how his commissions would be calculated.[3] (Pl.'s 56.1 ¶ 11.) Together, these documents constituted his employment agreement (the "2004 Plan").[4] (*Id.* ¶ 12;

---

Court refers to Defendant's Response to Plaintiff's Local Rule 56.1 Statement as "Def.'s 56.1 Opp'n."

[3] Plaintiff acknowledges that he was an at-will employee and signed a form while employed by Defendant to that effect. (Malik Decl., Ex. B.)

[4] Defendant maintains that the "one-page 'compensation summary' form . . . has not been confirmed by any witness of Defendants [sic] as having been attached to the offer letter." (Def.'s 56.1 Opp'n ¶ 11.) Nevertheless, Defendant concedes that the compensation summary, along with the offer letter, forms the 2004 Plan. (*Id.* ¶ 12; *see also* Def.'s Mem. at 1 n.2.)

Knox Decl., Exs. A, B.) The 2004 Plan provided that "[c]ommissions are earned based on customer commitment per compensation plan and paid by the end of the month for all collected revenues from the previous month." (Knox Decl., Ex. B.) The 2004 Plan also provided that commissions are paid for two years from the time Defendant received the first revenues from a sale.[5] (*Id.*; Pl.'s 56.1 ¶ 13.)

Beginning in May 2006, Defendant began circulating among salespersons a draft of a new agreement (the "2006 Plan") governing the payment of commissions. (Pl.'s 56.1 ¶ 25.) Defendant continued to solicit feedback from salespersons on drafts of the 2006 Plan from July to September 2006. (*Id.* ¶¶ 27-39.) On October 1, 2006, Defendant sent all salespersons, including Plaintiff, an e-mail stating: "Per our discussion last week, here is further clarification of our 2006 bonus plan. For all commissionable programs, regardless of year sold, the commission/bonus plan in place when the program [was] sold will be the plan used to calculate the commission for the program's commissionable life." (Jakab Decl., Ex. N.)

Plaintiff signed the 2006 Plan on October 5, 2006. (Pl.'s 56.1 ¶ 42.) The 2006 Plan provided that it superseded "[a]ll previous commission, compensation, bonus or individual agreements, understandings, arrangements, and plans." (Jakab Decl., Ex. M.)

---

[5] Defendant denies this reading of the 2004 Plan but provides no explanation for its denial or citation to authority in the record. (Def.'s 56.1 Opp'n ¶ 13.) Accordingly, the Court considers this fact undisputed. *See* Local Rule 56.1(d) ("Each statement . . . controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).").

2

For purposes of the parties' cross-motions for summary judgment, there are two significant differences between the 2004 and 2006 Plans. First, the 2006 Plan changed the language governing how a salesperson would earn a commission. While the 2004 Plan provided that "[c]ommissions are earned based on customer commitment" (Knox Decl., Ex. B), the 2006 Plan provided that commissions are earned "when billed revenues are collected" (Jakab Decl., Ex. M). Second, the 2006 Plan explicitly provided that, in general, it would be within Defendant's discretion to determine whether a terminated salesperson would receive commissions after his termination. (*Id.*) In the event of an "[i]nvoluntary separation due to cause," however, the 2006 Plan provided that the terminated salesperson would not be entitled to any commissions after his termination. (*Id.*) By contrast, the 2004 Plan contained no provision regarding the accrual of commissions after a salesperson's termination. (Knox Decl., Ex. B.)

On January 18, 2007, Defendant's Senior Vice President of Sales and Marketing, Glenn Dispenziere, circulated a PowerPoint presentation entitled the "2007 Commission Plan Discussion" to salespersons, including Plaintiff. (Pl.'s 56.1 ¶ 50; Jakab Decl., Ex. U.) While very similar to the 2006 Plan, this plan (the "2007 Plan") set forth new terms and conditions with respect to commission payments. In February 2007, Defendant e-mailed a slightly different version of the 2007 Plan described in the PowerPoint presentation to sales staff and asked them to sign it. (Pl.'s 56.1 ¶ 52; Jakab Decl., Ex. V.) Unhappy with the terms of the 2007 Plan, Victor Sese, another Regional Vice President of Sales, told Plaintiff that he would make changes to it. (Def.'s 56.1 ¶¶ 15-17.) Sese used a computer program to convert the 2007 Plan from a PDF document into an alterable Microsoft Word document, made various changes to the terms of the Plan, and then sent the Word document to Plaintiff. (*Id.* ¶¶ 18-19.) Thereafter, Plaintiff and Sese submitted signed versions of this altered document to Defendant. (*Id.* ¶¶ 21-22.)

When Dispenziere reviewed the 2007 Plans submitted by Plaintiff and Sese, he noticed that the documents had been altered. (Def.'s 56.1 ¶¶ 23-25.) On or about April 11, 2007, Dispenziere wrote on the revised 2007 Plan submitted by Plaintiff, "[v]oided — [c]hanges were made by Jamie Dreyfuss without notification." (*Id.* ¶ 26; Dreyfuss Dep., Ex. K.)

Defendant terminated Plaintiff and Sese on or about April 17, 2007. (Def.'s 56.1 ¶ 28.) At the time of Plaintiff's termination, Defendant had calculated his commissions owed for the first quarter of 2007 to be over $207,500.[6] (Pl.'s 56.1 ¶ 64; Jakab Decl., Ex. CC.) Defendant, however, did not pay Plaintiff any portion of that sum. (Pl.'s 56.1 ¶ 65.) Instead, Defendant presented Plaintiff with a "Separation Agreement and General Release," providing that Defendant would pay Plaintiff $202,396 if Plaintiff signed the document and released Defendant from all potential claims. (*Id.* ¶ 66; Jakab Decl., Ex. DD.) Plaintiff refused to sign this release, and Defendant refused to pay him any commissions. (Pl.'s 56.1 ¶ 69.)

After the commencement of this litigation in February 2008, however, Defendant sent Plaintiff checks in March, May, and October of 2009 for commissions

---

[6] As Defendant acknowledged in January 2007, Plaintiff and Sese were its top salespersons. (Jakab Decl., Exs. K, L.) In fact, Defendant forecast that in 2007 Plaintiff and Sese were to earn nearly $2 million in commissions on programs they had already sold. (*Id.* Ex. T.)

3

due through the first quarter of 2007. (*Id.* ¶¶ 70-74; Jakab Decl., Exs. EE, FF, GG.) These checks totaled $223,217.64 before taxes. (Pl.'s 56.1 ¶ 74; Jakab Decl., Exs. EE, FF, GG.) The parties executed a stipulation on February 9, 2010 providing that these three payments "represent commissions through the first quarter of 2007." (Jakab Decl., Ex. HH.) Accordingly, Defendant withheld $223,217.64 of Plaintiff's commissions for over two years.[7]

### B. Procedural History

Plaintiff filed the complaint underlying this action on February 4, 2008. On May 27, 2008, in response to the complaint, Defendant moved to compel arbitration or, alternatively, strike Plaintiff's demand for a jury trial. (Doc. No. 8.) Because Defendant did not meet its burden of proving the existence of a valid arbitration agreement, the Court denied Defendant's motion in an order dated November 14, 2008. (Doc. No. 18.) The Court likewise denied Defendant's subsequent motion to stay the proceedings pending an appeal to the Second Circuit. (Doc. Nos. 21, 27.) On October 15, 2009, the Second Circuit affirmed this Court's denial of Defendant's motion to compel arbitration or, alternatively, to strike Plaintiff's demand for a jury trial. (Doc. No. 43.)

Defendant filed its summary judgment motion on December 11, 2009, and Plaintiff filed his cross-motion for partial summary judgment on February 12, 2010. (Doc. Nos. 47, 54.) By March 26, 2010, both motions were fully submitted. (Doc. Nos. 65, 68.)

### II. STANDARD OF REVIEW

A court may grant summary judgment only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Bronx Household of Faith v. Bd. of Educ.*, 492 F.3d 89, 96 (2d Cir. 2007). The moving party bears the burden of showing that it is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (citation and internal quotation marks omitted); *accord Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986) (holding that summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Accordingly, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (citation and internal quotation marks omitted) (alteration in original).

Inferences and burdens of proof on cross-motions for summary judgment are the same as those for a unilateral summary judgment motion. *See Straube v. Fla. Union Free Sch. Dist.*, 801 F.Supp. 1164, 1174

---

[7] Despite the February 9, 2010 stipulation, Defendant denies that it withheld $223,217.42 of Plaintiff's commissions for over two years. (Def.'s 56.1 Opp'n ¶ 74.) It does not, however, cite any authority supporting its denial. (*Id.*) Accordingly, the Court considers this fact undisputed. *See* Local Rule 56.1(d).

4

(S.D.N.Y. 1992). "That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts." *U.S. Underwriters Ins. Co. v. Roka LLC*, No. 99 Civ. 10136 (AGS), 2000 WL 1473607, at *3 (S.D.N.Y. Sept. 29, 2000); *see also Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988).

### III. DISCUSSION

Plaintiff alleges that, in terminating his employment and refusing to pay him commissions owed, Defendant breached the 2004 and 2006 Plans and violated New York Labor Law § 190 *et seq*. Plaintiff also asserts causes of action for quantum meruit, unjust enrichment, promissory estoppel, and breach of the covenant of good faith and fair dealing. Defendant moves for summary judgment on all of Plaintiff's claims. Plaintiff in turn moves for summary judgment with respect to (1) liability and damages for certain commissions that Plaintiff earned under the 2004 Plan and (2) liability, but not damages, for commissions on eleven specific programs Plaintiff sold under the 2004 Plan.

For the following reasons, the Court (1) grants Plaintiff's motion as to liability only; (2) denies Defendant's motion with respect to Plaintiff's claims for breach of the 2004 Plan, violation of New York Labor Law based on the 2004 Plan, and breach of the covenant of good faith and fair dealing; and (3) grants Defendant's motion with respect to Plaintiff's claims for breach of the 2006 Plan, violation of New York Labor Law based on the 2006 Plan, quantum meruit, unjust enrichment, and promissory estoppel.

### A. Breach of Contract and Violations of New York Labor Law[8]

#### 1. Legal Framework

Under New York law, "an employer has the right to terminate an at-will employee at any time for any reason or for no reason, except where that right has been limited by express agreement." *Sabetay v. Sterling Drug, Inc.*, 506 N.E.2d 919, 921 (N.Y. 1987). The law is also clear, however, that an at-will employee can prevail on a breach of contract claim against his employer arising out of an employment agreement.[9] *See, e.g., Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000). In other words, an employer may terminate an at-will employee, but he cannot retroactively change the terms of the employment agreement he entered into with that employee. Rather, the employer is "entitled to change the terms of the employment agreement only prospectively, subject to [the employee's] right to leave the employment if the new terms [are] unacceptable."

---

[8] Plaintiff's cause of action under New York Labor Law is dependent upon the success of his breach of contract claims, as "[f]ailure to establish a contractual right to wages necessarily precludes a statutory claim under New York labor law." *Simas v. Merrill Corp.*, No. 02 Civ. 4400 (KTD), 2004 WL 213013, at *2 (S.D.N.Y. Feb. 4, 2004); *see also Graff v. Enodis Corp.*, No. 02 Civ. 5922 (JSR), 2003 WL 1702026, at *1 n.2 (S.D.N.Y. Mar. 28, 2003); *Tierney v. Capricorn Investors, L.P.*, 592 N.Y.S.2d 700, 703 (App. Div. 1993). Accordingly, the Court will analyze Plaintiff's breach of contract and labor law claims together.

[9] An enforceable employment agreement may take many forms — including as a formal document, an employee handbook, or even as an oral agreement. *See, e.g., Graff*, 2003 WL 1702026, at *1 (policy bulletin); *Bottini v. Lewis & Judge Co.*, 621 N.Y.S.2d 753, 753 (App. Div. 1995) (written agreement); *Dwyer v. Burlington Broadcasters, Inc.*, 744 N.Y.S.2d 55, 56 (App. Div. 2002) (oral agreement).

5

*Gebhardt v. Time Warner Entm't-Advance/Newhouse*, 726 N.Y.S.2d 534, 535 (App. Div. 2001). As such, when an employer alters the terms of an employment agreement prospectively, the employee has the choice between leaving his job or staying and being "deemed to have agreed" to the new arrangement. *Id.*

New York Labor Law requires employers to pay commission wages "in accordance with the agreed terms of employment, but not less frequently than once each month and not later than the last day of the month following the month in which they are earned." N.Y. Lab. Law § 191(1)(c) (McKinney 2008). Wages are defined as "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, *commission* or other basis." *Id.* § 190 (emphasis added). Additionally, an employer may not make "any deductions from wages, except as required by law or regulation, or authorized by the employee for the employee's benefit." *Hudacs v. Frito-Lay, Inc.*, 90 N.Y.2d 342, 346–47 (1997); *see also* N.Y. Lab. Law § 193 (listing circumstances in which deduction of employee's wages is allowed).

New York Labor Law reflects the state's "longstanding policy against the forfeiture of earned but undistributed wages." *Markby v. PaineWebber Inc.*, 650 N.Y.S.2d 950, 954 (Sup. Ct. N.Y. 1996), *aff'd* 664 N.Y.2d 520 (App. Div., 1997); *accord Aledia v. HSH Nordbank AG*, No. 08 Civ. 4342 (BSJ), 2009 WL 855951, at *2 (S.D.N.Y. Mar. 25, 2009). This "long-standing policy against the forfeiture of earned wages . . . applies to earned, uncollected commissions as well." *Arbeeny v. Kennedy Exec. Search, Inc.*, 893 N.Y.S.2d 39, 43 (App. Div. 2010). The law is clear that "[a]n employer and employee can agree about the point in time when a commission becomes 'earned' and, therefore, a 'wage.'" *Chenensky v. N.Y. Life Ins. Co.*, No. 07 Civ. 11504 (WHP), 2009 WL 4975237, at *8 (S.D.N.Y. Dec. 22, 2009).

If an employer wrongfully withholds earned wages, an employee may sue to recover the wages, as well as (1) prejudgment interest; (2) reasonable attorney's fees; (3) costs of the suit; and (4) liquidated damages of 25% of the withheld wages, if the employer willfully withheld the wages. N.Y. Lab. Law § 198(1-a); N.Y. C.P.L.R. § 5001(a) (McKinney 2010). "The purpose of these requirements is to ensure timely payment of commissions earned, and to grant greater than ordinary protection to an employee's right to wages." *Pashaian v. Eccelston Props., Ltd.*, No. 92 Civ. 5487 (JSM), 1993 WL 322835, at *2 (S.D.N.Y. Aug. 16, 1993) (citations omitted).

2. Analysis

a. Commissions under the 2004 Plan

Plaintiff alleges that, when he was terminated, Defendant owed him commissions earned under the 2004 Plan. Plaintiff distinguishes the commissions he seeks under the 2004 Plan into two categories: (1) commissions he should have been paid prior to his termination and (2) commissions, on eleven specific accounts, he should have been paid *after* his termination. The Court will discuss each of these categories of commissions in turn.

With respect to the first category, Defendant, through its actions, seems to acknowledge that Plaintiff's claim is meritorious. More than one year after the commencement of this action, Defendant paid Plaintiff $223,217 for "commissions"

6

owed through the first quarter of 2007. (Jakab Decl., Ex. HH.)  In its brief, Defendant attempts to minimize this fact by stating: "[d]uring the course of the litigation, a series of 'true-ups' were conducted and additional compensation was paid to James Dreyfuss for revenue collected by eTelecare prior to his termination."[10]  (Sullivan Decl. ¶ 9.)

Unfortunately for Defendant, neither the reimbursements themselves nor the description of the reimbursements as "true-ups" ends its liability for these commissions. Because Defendant clearly breached the 2004 Plan by withholding wages that Plaintiff had earned under the Plan for over two years, Plaintiff is entitled to prejudgment interest, reasonable attorney's fees, costs, and possibly liquidated damages on the withheld commissions.[11]  N.Y. Lab. Law § 198 (1-a); C.P.L.R. § 5001(a).

In its reply brief, Defendant argues that Section 198(1-a) should not apply in this case because Plaintiff never prevailed "in court on a wage claim." (Def.'s Reply at 8.) Both logic and precedent preclude this argument.  As discussed above, New York has a strong policy against employers withholding earned commissions.  *See Arbeeny*, 893 N.Y.S.2d at 43.  It would make no sense to allow an employer to skirt the penalties established in § 198(1-a) by letting it withhold wages until the moment before a lawsuit's conclusion.

Defendant cites to one case, *Mendez v. Nooch, Inc.*, No. 07 Civ. 11174 (LLS), 2000 WL 666771 (S.D.N.Y. Mar. 5, 2009), in support of his position.  (Def.'s Reply at 9.) *Mendez*, however, stands for precisely the opposite point for which Defendant uses it. The *Mendez* court held that, in calculating plaintiff's damage award for withheld wages, "prior payment . . . is to be deducted from the total amount of damages and wages determined to be owed." *Mendez*, 2009 WL 666771, at *5 (internal quotation mark omitted).  Contrary to Defendant's understanding, *Mendez* does not stand for the proposition that a prior payment of wages eliminates the penalties of § 198(1-a). Rather, the case merely stands for the proposition that a prior payment of withheld wages should be deducted from a Plaintiff's total damage award.  Applying that holding to this case means only that the $223,217 that Defendant has already paid Plaintiff must be subtracted from any damages award resulting from this action.

Accordingly, the Court grants summary judgment to Plaintiff on the first category of commissions he seeks under the 2004 Plan.

With respect to Plaintiff's claim for the second category of commissions,[12] the Court must determine whether, under the terms of the 2004 Plan, Plaintiff is entitled to commissions on programs Plaintiff sold but for which Defendant did not receive revenue

---

[10] Defendant also makes the point that the February 9, 2010 stipulation provided that it was not an "admission of liability."  (Def.'s Reply at 9 (citing Jakab Decl., Ex. HH).)  This language, however, does not overcome the fact that the stipulation explicitly provides that the payments are for "commissions" owed through the first quarter of 2007. (*Id.*)

[11] Plaintiff will receive liquidated damages only if Defendant withheld his earned commissions willfully, meaning it "knowingly, deliberately, or voluntarily disregard[ed] its obligation to pay wages." *Gustafson v. Bell Atl.*, 171 F. Supp. 2d 311, 327 (S.D.N.Y. 2001).

[12] Specifically, these eleven programs consisted of "four Ameriprise programs and seven Vonage programs."  (Pl.'s 56.1 ¶ 45.)

7

until *after* Plaintiff's termination.[13] (Pl.'s 56.1 ¶ 45.)

Defendant makes two arguments as to why Plaintiff is not entitled to commissions on these eleven programs. First, Defendant asserts that the 2004 Plan did not entitle Plaintiff to commission payments on programs for which Defendant did not receive revenue until after Plaintiff's termination. Second, Defendant argues that the 2006 and 2007 Plans, which explicitly stated that the payment of commissions after an employee's termination were within Defendant's discretion, superseded the 2004 Plan. The Court will address each of these arguments in turn.

i. The 2004 Plan's Language

Having closely reviewed the 2004 Plan, the Court concludes that the Plan contained two ambiguous, arguably contradictory provisions. The offer letter stated that Defendant was "pleased to offer [Plaintiff] the opportunity to receive *commission based on revenue closed*, a bonus based on profit margin, and a bonus based on quarterly attainment." (Knox Decl., Ex. A (emphasis added).) The letter further provided that "[d]etails of [Plaintiff's] commission and bonuses" were included in the "compensation proposal attached." (Knox Decl., Ex. A.) The attached compensation proposal, however, provided that "[c]ommissions are earned *based on customer commitment* per compensation plan and paid by the end of the month for all collected revenues from the previous month." (*Id.* at Ex. B (emphasis added).)

Defendant asks the Court to rule as a matter of law that the 2004 Plan provided that commissions would be *earned upon the receipt of revenue* and that "the commission rate applied to a particular deal is based on the level of contract revenue committed to by the customer in its compensation plan with eTelecare." (Def.'s Mem. at 8 (emphasis omitted).) The 2004 Plan, however, clearly does not contain such a statement.

Conversely, Plaintiff asks the Court to rule as a matter of law that the 2004 Plan provided that commissions would be *earned at the time of customer commitment*. However, while it is true that the 2004 Plan stated that "commissions are earned *based on customer commitment*," it is not clear that such commissions would be earned *at the time of* customer commitment. Therefore, the 2004 Plan's language was ambiguous regarding when commissions are earned.

In general, "if a term or clause [of a contract] is ambiguous and determination of the parties' intent rests on extrinsic evidence or a choice among inferences drawn from that evidence, it presents a question of fact not appropriate for resolution by summary judgment." *Simas*, 2004 WL 213013, at *3. "Summary judgment may still be appropriate, however, if after considering all the material evidence, a rational fact finder could only find for the movant." *Id.* (citing

---

[13] These eleven programs, despite being sold after 2004, were sold when the 2004 Plan was in effect. Notwithstanding Defendant's argument to the contrary, the 2004 Plan contained no provision stating that the Plan expired on December 31, 2001. (*See* Knox Decl., Ex. B.) The chart in the 2004 Plan, which contained a row labeled "effective date" with three corresponding columns labeled "1/1/2004 – 12/31/2004" merely demonstrates how commission rates are calculated. (*Id.*) Furthermore, the record contains absolutely no evidence that Defendant ever implemented a plan in between the 2004 Plan and the 2006 Plan's implementation in October 2006. Finally, Plaintiff's former boss testified that the 2004 Plan "remained in force for 2005 and [was] still in force at the time of [her] departure from eTelecare in May 2005." (Knox Decl. at 3.)

8

*Pryor v. USX Corp.*, 806 F. Supp. 460, 463 (2d Cir. 1992).

In this case, summary judgment is appropriate because, after considering all the evidence in the record, the Court concludes that a rational fact finder could only find that Plaintiff's interpretation of when commissions are earned under the 2004 Plan is correct. Setting aside the fact that Defendant drafted the 2006 Plan to clearly provide that commissions were earned when revenue was collected and did not include the same specific statement in the 2004 Plan (Jakab Decl., Ex. M), there is *no* evidence in the record to suggest that the parties ever intended to defer the earning of commissions until after the receipt of revenue.

On the other hand, there is substantial evidence in the record supporting Plaintiff's interpretation of the 2004 Plan — namely, that commissions were *earned* at the time of customer commitment and *paid* when revenues from the program were received. Most significantly, Susan Knox, Defendant's former Senior Vice President of Sales and Marketing, drafted the 2004 Plan and testified that the Plan was intended to secure sales commissions at the time of the program's sale:

> Specifically, those terms state that "commissions are earned based on customer commitment." That term was written by me to express that salespersons' commissions were earned once the customer commits to a sale. My intent in writing that term was to assure each salesperson that he or she would remain entitled to the 2004 commission and bonus plan's full two years of commissions and bonus on sales closed. My understanding of the 2004 commissions and bonus plan is that once a sale is made under it, the salesperson will be entitled to the full two years of commissions according to its formula, even if, for example, the salesperson's employment were subsequently terminated, or [the] salesperson's compensation terms were subsequently changed, by eTelecare.

(Knox Decl. at 3.) Plaintiff and Sese have testified to the same effect. (Dreyfuss Decl. ¶¶ 12-13; Sese Depo. Tr. at 23.) Defendant argues that the Court should not credit Knox's, Plaintiff's, or Sese's testimony, but puts forth no evidence to controvert it.

Accordingly, the Court rules as a matter of law that the 2004 Plan provided that commissions were earned at the time of customer commitment and paid when revenues were received.

ii. The Effect of the 2006 and 2007 Plans

Defendant alternatively argues that, even if the Court interprets the 2004 Plan to provide that commissions are earned at the time of customer commitment, Plaintiff is still not entitled to commissions on the eleven accounts. Defendant maintains that the 2004 Plan was superseded by the 2006 and 2007 Plans, which provided that they superseded "[a]ll previous commission, compensation, bonus or individual agreements, understandings, arrangements and plans." (Dreyfuss Decl., Ex. J.)

The 2006 and 2007 Plans, however, could not strip Plaintiff of commissions he already earned under the 2004 Plan — even if Defendant intended those Plans to do so.

9

As described above, New York Labor Law reflects a strong policy against the forfeiture of earned commissions. *See Arbeeny*, 893 N.Y.S.2d at 43. Accordingly, the 2006 and 2007 Plans could only change (and, in fact, did change) the method by which Plaintiff earned commissions *prospectively*. *See Gebhardt*, 726 N.Y.S.2d at 535. Because commissions under the 2004 Plan were earned at the time of customer commitment, the commissions on the eleven specific programs that Plaintiff earned under the 2004 Plan were unaffected by the 2006 and 2007 Plans.

Accordingly, the Court grants summary judgment to Plaintiff as to liability for all commissions earned under the 2004 Plan.

b. Commissions under the 2006 Plan

Plaintiff's complaint alleges that Defendant violated New York Labor Law by withholding commissions — specifically, commissions on three Vonage programs — earned under the 2006 Plan. (Compl. ¶¶ 42-43.) In his moving papers, however, Plaintiff correctly concedes that the 2006 Plan clearly provides that commissions are earned based upon the receipt of revenue and that commissions are paid after an employee's termination only at Defendant's discretion. (Pl.'s Mem. at 3; Jakab Decl., Ex. M.) Because Defendant did not receive any revenues from the Vonage programs until after Plaintiff's termination, Plaintiff never earned any commissions on these programs prior to his termination. Therefore, Defendant was never in breach of the 2006 Plan.

Accordingly, the Court grants summary judgment to Defendant on Plaintiff's breach of contract and New York Labor Law claims with respect to the 2006 Plan.

B. Breach of the Covenant
of Good Faith and Fair Dealing

Although Defendant did not breach the 2006 Plan, Plaintiff maintains that Defendant breached the covenant of good faith and fair dealing by firing him. According to Plaintiff, Defendant terminated him in order to avoid paying him commissions on the three Vonage programs sold under the 2006 Plan, as well as on a Morgan Stanley/Discover program, which was sold after Plaintiff's termination but on which he "had been working for over a year."[14] (Dreyfuss Decl. ¶ 48.) Defendant disputes this assertion, contending that Dispenziere and Defendant's management team decided to terminate the employment of both Plaintiff and Sese because they had altered the 2007 Plan. (Def.'s 56.1 ¶¶ 27, 29.)

Under New York law, every contract implies a covenant of good faith and fair dealing. *See Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). This covenant entails that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933). In general, however, "[t]he implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198-99 (2d Cir. 2005) (citations and internal quotation marks omitted).

---

[14] Plaintiff has withdrawn his claim that Defendant also terminated him to avoid paying commissions on a Sprint program that was about to be sold prior to Plaintiff's termination. (Pl.'s Opp'n at 20 n.14.)

Because Plaintiff was Defendant's at-will employee, it would seem impossible for Defendant to have breached the covenant of good faith and fair dealing by firing him. Plaintiff, however, claims that his case fits squarely into an exception carved out by *Wakefield v. N. Telecom, Inc.*, 769 F.2d 109 (2d Cir. 1985). Applying New York law, the Second Circuit in *Wakefield* allowed a salesman's claim for unpaid commissions to proceed to a jury on the theory that his employer breached the covenant of good faith and fair dealing by firing him "to avoid paying him commissions that were virtually certain to become vested." *Id.* at 114. The *Wakefield* Court held that, in order to find for the plaintiff, a jury would have to determine that such an intention was a "substantial motivating factor" in the plaintiff's termination. *Id.*

Plaintiff maintains that his case aligns with *Wakefield* in that it presents many facts which could lead a jury to decide that his termination was "substantially motivated" by Defendant's desire to avoid paying him commissions on the three Vonage programs and the MorganStanley/Discover program. For example, Plaintiff points to evidence in the record that (1) Dispenziere complained that Sese and Plaintiff earned too much money in commissions and threatened to withhold commissions in order to coerce Plaintiff into "doing what he demanded" (Jakab Decl., Ex. O; Dreyfuss Decl. ¶¶ 38-39); (2) Dispenziere was looking for ways to terminate Plaintiff (Samojednik Decl. ¶¶ 3-5; Sese Depo. Tr. at 126); (3) Dispenziere's own incentive bonus was primarily based on Defendant's profits, which increased after Plaintiff's and Sese's terminations (Jakab Decl., Exs. LL, AA); and (4) the salespersons who replaced Plaintiff received substantially reduced commissions, to the ultimate benefit of Defendant (Mahoney Depo. Tr. at 35-38).

Defendant's argument is two fold. First, it maintains that *Wakefield* is no longer good law. Second, it claims that, even if *Wakefield* remains good law, there are no facts from which a jury could conclude that Defendant terminated Plaintiff in order to avoid paying him commissions.

As an initial matter, "*Wakefield* claims are still viable in employment sales commissions cases." *Bravia Capital Partners, Inc. v. Fike*, No. 09 Civ. 6375 (JFK), 2010 WL 3359470, at *7 (S.D.N.Y. Aug. 25, 2010); *see also Arbeeny*, 893 N.Y.S.2d at 44 (relying on *Wakefield* for the proposition that "[a] contract cannot be read to enable the defendant to terminate an employee for the purpose of avoiding the payment of commissions which are otherwise owed" (internal quotation marks omitted)). Therefore, the Court rejects Defendant's argument that the *Wakefield* exception is no longer viable.

With respect to Plaintiff's second argument, the Court agrees with Plaintiff that there are facts in the record, as described above, from which a jury could conclude that Defendant's termination of Plaintiff was "substantially motivated" by a desire to avoid paying him commissions on the three Vonage programs closed under the 2006 Plan, as well as the MorganStanley/ Discover program. Thus, the Court cannot decide this claim as a matter of law.

Accordingly, the Court denies Defendant's summary judgment motion with respect to Plaintiff's claim for breach of the covenant of good faith and fair dealing.

### C. Remaining Claims

Defendant moves for summary judgment on Plaintiff's causes of action for quantum meruit, unjust enrichment, and promissory

11

estoppel. Plaintiff does not respond to Defendant's motion in connection with these claims, nor could he.[15] These quasi-contract claims are precluded by the existence of valid employment agreements. *See Graff*, 2003 WL 1702026, at *2 ("Because . . . the parties entered into an enforceable contract that governs the subject matter of this action, plaintiff cannot recover in quasi contract."); *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997). The payment or non-payment of commissions to Plaintiff is clearly governed by the terms of the employment agreements in the record. Furthermore, "New York law does not recognize promissory estoppel in the employment context." *Bessemer Trust Co., N.A. v. Branin*, 498 F. Supp. 2d 632, 639 (S.D.N.Y. 2007).

Accordingly, the Court grants Defendant's motion for summary judgment with respect to Plaintiff's claims for quantum meruit, unjust enrichment, and promissory estoppel.

### IV. CONCLUSION

For the foregoing reasons, the Court (1) GRANTS Plaintiff's motion as to liability only; (2) DENIES Defendant's motion with respect to Plaintiff's claims for breach of contract and violation of New York Labor Law based on the 2004 Plan, as well as for Plaintiff's claim for breach of the covenant of good faith and fair dealing; and (3) GRANTS Defendant's motion with respect to Plaintiff's claims for breach of contract and violation of New York Labor Law based on the 2006 Plan, as well as for quantum meruit, unjust enrichment, and promissory estoppel.

Accordingly, IT IS HEREBY ORDERED that parties shall appear for a pretrial conference on Wednesday, October 27, 2010 at 10:00 a.m. in Courtroom 21C to discuss how this matter will proceed with respect to the remaining causes of action and damages.

The Clerk of the Court is directed to terminate the motions located at Doc. Nos. 47 and 54.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2010
New York, New York

\* \* \*

Plaintiff is represented by Peter Jakab of Fein & Jakab, 233 Broadway, Suite 930, New York, New York, 10279. Defendant is represented by Andrew Paul Marks, Adam Malik, and Sara Danielle Sheinkin of Littler Mendelson, P.C., 900 Third Ave., New York, New York, 10022, as well as Deke Wayne Bond of Gorlick, Kravitz & Listhaus, P.C., 17 State Street, 4th Floor, New York, New York, 10004.

---

[15] "The Court also notes that, under New York state law, the failure to provide argument on a point at issue constitutes abandonment of the issue." *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y.), *aff'd* 130 F.3d 1101 (2d Cir. 1997).

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/10